UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                    :
UNITED STATES OF AMERICA,                           :
                                                    :
        - against -                                 :
                                                    :    15 Cr. 252 (S-1) (PKC) (RML)
JEFFREY WEBB, et. al.,                               :
                                Defendants.          :
                                                    :
------------------------------------------------------------x

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT COSTAS TAKKAS'
# MOTION FOR SEVERANCE

MEHLER LAW PLLC
747 Third Avenue, 32nd Floor
New York, NY 10017-2803
Tel:  212-661-2414

*Attorneys for Defendant Costas Takkas*

# **TABLE OF CONTENTS**

Preliminary Statement.................................................................................................................. 1

Statement of Facts...................................................................................................................... 3

   A.    Substantive (Non-RICO Count) Paragraphs Mentioning Mr. Takkas ............................ 3

   B.    Remaining Arraigned Defendants From Elsewhere in the World.................................. 7

   C.    Massive Superseding Indictment Encompassing 27 Defendants .................................. 10

Argument ................................................................................................................................. 13

   A.    Principles Governing Severance................................................................................ 13

   B.    Massive Spillover Prejudice Against Mr. Takkas Will Ensue ...................................... 18

   C.    That Massive Prejudice to Mr. Takkas Cannot Be Cured By Limiting Instructions....... 19

   D.    Severing the Co-Defendants and the RICO Count Will Promote the Efficient
Administration of Justice.......................................................................................... 21

Conclusion ............................................................................................................................... 23

# TABLE OF AUTHORITIES

## Cases

*Drew v. United States*, 331 F.2d 85 (D.C. Cir. 1964) .................................................................. 19

*United States v. Asaro*, No. 14-CR-26 ARR (E.D.N.Y. August 20, 2014) ................................. 22

*United States v. Branker*, 395 F.2d 881 (2d Cir. 1968) .......................................................... 20, 22

*United States v. Burke*, 789 F.Supp.2d 395 (E.D.N.Y. 2011) ..................................................... 20

*United States v. Cardascia*, 951 F.2d 474 (2d Cir. 1991) ......................................................... 16

*United States v. Casamento*, 887 F.2d 1141 (2d Cir. 1989) ...................................................... 18

*United States v. Delatorre*, 522 F.Supp.2d 1034 (N.D. Ill. 2007) ......................................... 23, 24

*United States v. DiNome*, 954 F.2d 839 (2d Cir. 1992) .............................................................. 22

*United States v. Dowtin,* 2012 U.S. Dist. LEXIS 186749 (E.D.N.Y. 2012) ................................ 18

*United States v. Farano*, 749 F.3d 658 (7th Cir. 2014) ............................................................. 23

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) ........................................................... 17

*United States v. Friedman*, 854 F.2d 535 (2d Cir. 1988) ........................................................... 16

*United States v. Gallo*, 668 F. Supp. 736 (E.D.N.Y. 1987) ....................................... 16, 18, 22, 23

*United States v. Graham*, 477 Fed. Appx. 818 (2d Cir. 2012) ..................................................... 16

*United States v. Jones*, 16 F.3d 487 (2d Cir. 1994) ..................................................................... 20

*United States v. Kahaner*, 203 F. Supp. 78 (S.D.N.Y. 1962) ...................................................... 17

*United States v. Menashe*, 741 F.Supp.1135 (S.D.N.Y. 1990) .................................................... 20

*United States v. Moten*, 564 F.2d, 620 (2d Cir. 1977) ................................................................ 17

*United States v. Nicolo*, 421 Fed. Appx. 57 (2d Cir. 2011) ........................................................ 17

*United States v. Ramos*, 2009 WL 1619912 .............................................................................. 20

*United States v. Spinelli*, 352 F.3d 48 (2d Cir. 2003) ................................................................. 18

*United States v. Upton*, 856 F. Supp. 727 (E.D.N.Y. 1994) ...................................................... 18

*United States v. Walker*, 142 F.3d 103 (2d Cir. 1998) ................................................................ 24

*United States v. Wilkinson*, No. 07-CR-570 WMN (D.Md. July 9, 2008) ................................. 18

*Zafiro v. United States*, 506 U.S. 534 (1993) .............................................................. 16, 17, 18, 19

## Rules

Rule 14 ........................................................................................................................................ 4, 16

Rule 8(b) .......................................................................................................................................... 16

## Judicial Documents

Original Indictment .......................................................................................................................... 7

Superseding Indictment ("S-1") ............................................................................................... passim

**PRELIMINARY STATEMENT**

Costas Takkas respectfully submits this memorandum of law in support of his motion, pursuant to Rule 14 of the Federal Rules of Criminal Procedure, for severance from the three remaining co-defendants and severance of the RICO count from the other substantive counts against Mr. Takkas.  This severance is warranted for two reasons: first, because the charges against Mr. Takkas are much more limited in scope compared to those against the co-defendants and compared to the virtual encyclopedia of alleged crimes recited in the kitchen-sink RICO count; and second, because the charges against Mr. Takkas are completely unrelated to the remaining co-defendants' alleged schemes. As a result, there is a severe risk of spillover prejudice that will make any joint trial— whether with the remaining co-defendants *or* with the RICO count—an unfair one.

The disparity in allegations against Mr. Takkas and these co-defendants is enormous.  First, there is a stark difference in *scope* between the allegations.  Two of the three remaining co-defendants are alleged to have solicited and accepted millions of dollars in bribes for themselves in multiple schemes over a substantial period of time.  By contrast, Mr. Takkas is not alleged to have received *any* money earmarked for his alleged role. Rather, he is alleged only to have aided the receipt of payments intended for Jeffrey Webb for a single contract involving the Caribbean Football Union (CFU).

Second, there is a terrible mismatch in the *positions* of Mr. Takkas and the remaining co-defendants.  Two of the three remaining co-defendants were presidents of

1

major national soccer federations in Brazil and Paraguay, who also maintained high-ranking positions within FIFA itself; the third was a high-ranking judge in Guatemala in addition to his soccer-related position as the general secretary of Guatemala's soccer federation.  These co-defendants wielded significant and wide-ranging official power to negotiate and influence contracts on behalf of nations and international organizations and are alleged to have demanded and received substantial bribes to influence those decisions.  In sharp contrast, Mr. Takkas is a sad, semi-retired accountant with a deep love of soccer and too much time on his hands.  He had no position of power in any soccer organization—indeed, he has not been a soccer official for more than two decades—and is alleged to have been used by Mr. Webb to accept part of a payment to Mr. Webb, with none of the money earmarked for himself.[1]

Given these vast differences, without a severance of the co-defendants and a severance of the massively prejudicial RICO count from the other, far more concise, substantive counts, Mr. Takkas will be subject to very significant spillover prejudice that will almost surely result in transference of guilt to him.  The remaining co-defendants have virtually nothing to do with Mr. Takkas' cameo appearance in this case.  Not only are the events unrelated, and not only are the co-defendants and Mr. Takkas not from the same cities or countries, they are not even from the same continents.  Further, they are alleged to have directly solicited and received bribes and kickbacks far removed in time

---

[1] Though the government claims Mr. Takkas was an "attaché" to Mr. Webb, this descriptor is neither a formal title nor a position. While Mr. Takkas once held the position of secretary-general of the miniscule Cayman Islands Football Association in the mid-1990s, that was almost 20 years before any of the allegations against Mr. Takkas in the indictment. *See* Affirmation of Gordon Mehler at ¶ 2-3.

and scope from the allegations of bribe-facilitation against Mr. Takkas.  Failing to sever

Mr. Takkas from the remaining co-defendants and from the RICO count will, in short,

risk subjecting him to guilt by association with an overpowering stench of unfairness.

## STATEMENT OF FACTS

The 92-count superseding indictment, as well as the original indictment and

separate charges against related individuals, spans a nearly three-decade period and

involves approximately 42 defendants (including numerous alleged fugitives, cooperating

witnesses, and uncharged co-conspirators) and at least 39 diverse schemes.  Given both

the many submissions in this massive case and the 25-page allowable maximum length of

this memorandum, we assume the Court's familiarity with details of the superseding

indictment.  In this memorandum, we instead do three things.  First, we set out a detailed

recitation of the substantive paragraphs related to the one scheme in which Mr. Takkas

makes an appearance; second, we discuss the allegations against the remaining co-

defendants who appeared at the last status conference[2]; third, we contextualize the stark

disparities between Mr. Takkas and the co-defendants by briefly discussing the overall

indictment.

A.      Substantive (Non-RICO Count) Paragraphs Mentioning Mr. Takkas

In addition to being charged in the RICO count along with all other defendants,

Mr. Takkas is alleged to have participated in just one of the fifteen substantive schemes

alleged by the government: the so-called Caribbean Football Union (CFU) World Cup

---

[2] A new co-defendant from Peru, Manuel Burga, has since been added.  But he was arraigned quite recently on December 2, 1016 (ECF Dkt # 507) and is nearly a year behind the other co-defendants, so we exclude him.

Qualifier Scheme #2, which is discussed in a bit over six pages of the 236-page indictment. *See* Superseding Indictment ("S-1") ¶¶ 318-33.

Although the allegations against Mr. Takkas are conclusory, the indictment alleges that Enrique Sanz (called "Co-Conspirator #3") negotiated on behalf of Traffic USA "a contract to acquire the media and marketing rights to the 2018 and 2022 World Cup qualifier matches from the CFU member associations." S-1 ¶ 318. Jeffrey Webb—a "high-level CFU official" and president of the Cayman Islands soccer federation, one of the 31 entities that made up the CFU—was on the opposite side of the negotiating table. Around the same time, Mr. Webb chose Mr. Sanz to be his top deputy at CONCACAF, the confederation that governs international soccer in North and Central America and the Caribbean. At this point Mr. Sanz suddenly switched sides. *See id.*

Next, the indictment alleges that Mr. Takkas informed Mr. Sanz (before his switch to CONCACAF) that Mr. "Webb wanted a $3 million bribe in exchange for his agreement to cause the CFU contract to be awarded to Traffic USA" and that Mr. Sanz agreed. S-1 ¶ 319. In the previous iteration of the indictment, this meeting is said to have occurred in Hungary. *See* Original Indictment ¶ 225. Now the government is apparently uncertain about the details of the meeting and chose not to specify a place or even a date, unlike many other allegations in the indictment. *See* S-1 ¶ 319. Mr. Takkas will forcefully contest this allegation at any trial (that is assuming Mr. Sanz is even able to testify at any trial[3]).

---

[3] There are rumors about the health and whereabouts of Mr. Sanz. It does little good to recite them here or in an

4

At this point, two erstwhile competitors in the media and marketing industry, Traffic USA and Media World, are alleged to have joined forces in the spring of 2012 to share revenue from the purchase of World Cup qualifier rights, which included rights to CFU qualifier matches. *See* S-1 ¶ 320. Various defendants who have pled guilty— including Aaron Davidson, Roger Huguet and Fabio Tordin—"participated in the negotiation over the terms of the partnership." *Id.* Mr. Takkas, by contrast, is not mentioned or alleged to have participated in the negotiation. Further, the two companies also allegedly agreed to split the payment to Webb, and a Media World employee (called "Co-Conspirator #5") allegedly said that Mr. Takkas would contact Mr. Huguet to arrange for the payment. S-1 ¶ 321.

Later in the spring and summer of 2012, Mr. Webb and Mr. Sanz assumed their new positions at CONCACAF—Mr. Webb in May as president and Mr. Sanz in July as general secretary. S-1 ¶ 322. By August 28, 2012, Traffic USA and Media World had entered into an agreement to pay $23 million "for the exclusive worldwide commercial rights for CFU's 2018 and 2022 World Cup qualifier matches." S-1 ¶ 323.

It is then alleged that Mr. Sanz both put Mr. Takkas in touch with Traffic executives in Brazil, and participated in follow-up meetings by phone in Miami and in person in Brazil to effectuate a payment for Mr. Webb "made to accounts held in the name of entities controlled by Mr. Takkas … and then forwarded on through an

---

affirmation because, like many rumors, they cannot yet be established as true. But this Court can take judicial notice of the fact that charges against so many individuals and entities have been made public in this case. Mr. Sanz, a major player who is deeply involved in the events described in the indictment, is conspicuously, and quizzically, absent from this list.

intermediary account to Jeffrey Webb." S-1 ¶ 324.  On November 13, 2012, $1.2 million was wired by Traffic International (like Traffic USA, a subsidiary of the Traffic Group) to another company that had an account at HSBC in Hong Kong.  S-1 ¶ 325.  There is no allegation in the indictment that Mr. Takkas knew of, or was on notice of, Traffic International's internal banking arrangements.

On November 21, 2012, the company assisting Traffic International sent wire transfers of $750,000 and $250,000 through New York to a Kosson Ventures account allegedly controlled by Mr. Takkas at Fidelity Bank in the Cayman Islands.  The remaining $200,000 was paid to a Florida resident identified as Co-Conspirator #23, with no indication again that Mr. Takkas was aware of financial dealings between that individual and Traffic International.  S-1 ¶ 325.  On December 14, 2012, Traffic International made a third transfer, of $500,000, to another account allegedly overseen by Mr. Takkas, through the account of a business associate of Traffic's founder, Jose Hawilla.  The indictment charges that part of those funds were subsequently transferred to, among others, a swimming pool builder and a realtor in Georgia (where Mr. Webb had family ties).  S-1 ¶¶ 326-27.

The indictment then turns to the way Media World paid its portion of money to Mr. Webb, using a production company related to another media company and a consulting company targeted by Mr. Huguet of Media World.  S-1 ¶ 328.  Again, there is no hint in the narrative that Mr. Takkas was privy to any of this.

6

There is no mention of Mr. Takkas in the next two paragraphs either, which describe Mr. Huguet's involvement with others in a false invoice scheme and discussions between Mr. Davidson and Mr. Hawilla of Traffic about securing money for Mr. Webb from Media World.  S-1 ¶¶ 329-30.

Mr. Takkas receives a brief additional mention related to media and marketing rights for CFU World Cup qualifier matches.  The government alleges meetings in 2014 between Mr. Takkas and Mr. Huguet.  S-1 ¶¶ 331-32.  Then Media World, concerned about the FIFA investigation, stopped making payments.  S-1 ¶¶ 331-32.  Finally, the indictment asserts that Mr. Takkas' participation as an intermediary with Traffic and Media World "was intended to conceal the fact that Jeffrey Webb was the beneficiary of the payments.  S-1 ¶ 333.  Those are essentially the substantive/narrative allegations against Mr. Takkas.[4]

B.    Remaining Arraigned Defendants From Elsewhere in the World

In addition to Mr. Takkas, there are three remaining co-defendants currently scheduled for trial in November 2017.  The first, Jose Maria Marin, is a citizen of Brazil and former president of the Brazilian soccer federation (the Confederação Brasileira de Futebol, or CBF).  S-1 ¶ 50.  In addition, Mr. Marin has also served as a member of (and advisor to) multiple FIFA standing committees, including the organizing committee for

---

[4] Mr. Takkas is charged in Counts 1 (RICO conspiracy), 68 (wire fraud conspiracy, Scheme G), 69 (wire fraud, Scheme G), 70 (wire fraud, Scheme G), 71 (wire fraud, Scheme G), 72 (wire fraud, Scheme G), 73 (money laundering conspiracy, Scheme G), 74 (money laundering, Scheme G), 75 (money laundering, Scheme G), and 76 (money laundering, Scheme G).

major international soccer tournaments, including the Olympics, the FIFA World Cup and the FIFA Confederations Cup. *Id.*

Mr. Marin is alleged to have participated in three schemes.[5] First, Mr. Marin is alleged to have solicited and received six-figure bribes from Alejandro Burzaco, a minority owner and day-to-day manager of the media company Torneos, and "Co-Conspirator #12," in exchange for continued support for a Torneos affiliate holding the exclusive rights to the CONMEBOL Copa Libertadores tournament and other international soccer tournaments. S-1 ¶¶ 114, 183 (Scheme D). Second, Mr. Marin is alleged to have solicited and received bribes from Mr. Hawilla for himself and others in exchange for Traffic's continued media rights to the Copa do Brasil national soccer tournament. S-1 ¶ 192 (Scheme E). The government alleges Mr. Marin met with Mr. Hawilla to "discuss[] the status of the payments due to him" and that Mr. Hawilla explicitly agreed that "Of course … [t]hat money had to be given to you." S-1 ¶¶ 194. Third, Mr. Marin is alleged to have received a seven-figure bribe for signing contracts between the new media rights company Datisa—which was formed out of the companies Traffic, Torneos, and Full Play—and CONMEBOL, the South American soccer confederation, for the rights to multiple CONMEBOL Copa America and CONMEBOL/CONCACAF Centenario soccer tournaments. S-1 ¶¶ 133, 344-46, 348 (Scheme O).

---

[5] Mr. Marin is charged in Counts 1 (RICO conspiracy), 9 (money laundering, Scheme D), 10 (wire fraud, Scheme D), 11 (wire fraud, Scheme E), 12 (wire fraud, Scheme E), 83 (wire fraud, Scheme O), and 84 (wire fraud, Scheme O).

8

The second remaining co-defendant, Juan Angel Napout, a citizen of Paraguay, is the former president of both CONMEBOL and the Paraguayan national soccer federation. S-1 ¶¶ 41. In addition, Mr. Napout was a FIFA vice president and member of FIFA's executive committee and multiple standing committees. *Id.*

Mr. Napout is alleged to have participated in two criminal schemes.[6] First, Mr. Napout is alleged to have been part of the "Group of Six," a bloc of "six presidents of the traditionally less-powerful member associations of CONMEBOL" who solicited and received bribes from Mr. Burzaco and a co-conspirator in exchange for their continued support for a Torneos affiliate holding the exclusive rights to the CONMEBOL Copa Libertadores tournament and other international soccer tournaments. S-1 ¶¶ 114, 181-83 (Scheme D). Second, Mr. Napout is alleged to have received a major bribe for signing a contract between Datisa and CONMEBOL for the rights to multiple Copa America soccer tournaments. S-1 ¶¶ 344-46, 348 (Scheme O).

The third remaining co-defendant, Hector Trujillo, is a citizen of Guatemala and a former judge on the Constitutional Court of Guatemala. In addition, he was the general secretary of FENAFUTG, Guatemala's national soccer federation. S-1 ¶ 38. Mr. Trujillo is alleged to have participated in one criminal scheme involving the UNCAF (Central America) Region's World Cup qualifying matches.[7] He is alleged to have been one of many officials to accept multiple bribes from Media World and Traffic for the media

---

[6] Mr. Napout is charged in Counts 1 (RICO conspiracy), 9 (money laundering, Scheme D), 10 (wire fraud, Scheme D), 83 (wire fraud, Scheme O), and 84 (wire fraud, Scheme O).
[7] Mr. Trujillo is charged in Counts 1 (RICO conspiracy), 42 (wire fraud conspiracy, Scheme I), 43 through 46 (wire fraud, Scheme I), 47 (money laundering conspiracy, Scheme I), and 48 (money laundering, Scheme I).

rights to Guatemala's 2018 and 2022 World Cup qualifier matches.  S-1 ¶¶ 112, 238, 263-70 (Scheme I).

In sum, each of the three remaining co-defendants is charged in counts that are entirely distinct from, and have no overlap with, the charges against Mr. Takkas. There are major distinctions in the nature of the alleged criminal schemes, the geography of those schemes, and the official positions of the defendants.

C.    Massive Superseding Indictment Encompassing 27 Defendants

Going far beyond the one substantive scheme alleged against Mr. Takkas, the 92-count superseding indictment charges 27 defendants (acting with numerous defendants who have pled guilty and uncharged co-conspirators) in 39 diverse conspiracies[8] encompassing 53 substantive charges[9] committed over the span of some 25 years.  The government itself sorts its case into fifteen diverse schemes.  The sheer size of the case is staggering.

The overarching charge in the case is RICO conspiracy.  S-1 ¶¶ 362-64 (describing Count One).  The government alleges that all 27 defendants in the superseding indictment, acting in concert with others, agreed to and engaged in a pattern of racketeering activity via their positions within associated national and multinational soccer organizations.  *See id*.  According to the government, the co-defendants and co-conspirators, over the course of two decades, "rose to positions of power and influence"

_____

[8] Distinct conspiracies are charged in Counts 1, 2, 5, 7, 8, 9, 10, 11, 12, 13, 16, 18, 24, 26, 29, 31, 36, 38, 41, 42, 47, 49, 51, 53, 55, 57, 58, 61, 63, 64, 65, 68, 73, 75, 77, 81, 83, 84, and 92.
[9] The substantive offenses are charged in Counts 3, 4, 6, 14, 15, 17, 19, 20, 21, 22, 23, 25, 27, 28, 30, 32, 33, 34, 35, 37, 39, 40, 43, 44, 45, 46, 48, 50, 52, 54, 56, 59, 60, 62, 66, 67, 69, 70, 71, 72, 74, 76, 78, 79, 80, 82, 85, 86, 87, 88, 89, 90, and 91.

within several associated national and international soccer organizations and then used

that power in a loosely coordinated effort to corrupt those organizations by engaging in

bribery and fraud to the tune of some $200 million.  S-1 ¶¶ 98-100.  The bribery and

fraud schemes the government alleges are diverse, from the selection of FIFA World Cup

host nations (SS ¶ 102) and leadership (S-1 ¶¶ 292-303), to diverting and embezzling

official funds for personal use and enrichment (S-1 ¶¶ 103, 105, 117), to corrupting

soccer media and marketing relationships (S-1 ¶¶ 106-16).

The vast majority of the allegations are alleged to have taken place between

1983—with the rise of major international soccer figures Jack Warner, Nicolas Leoz,

Ricardo Teixeira, and others (including the cooperating witness Charles Blazer), to

prominence within FIFA and various continental, regional, and national soccer

organizations—and 2011–2013, with the resignations of Mr. Warner, Mr. Leoz, and Mr.

Teixeira.  *See* S-1 ¶¶ 101-108 ("The Initial Corruption of the Enterprise"); S-1 ¶ 120

("Scandals and Resignations").

Following the high-profile resignations, the government alleges that a new crop of

leaders within the soccer world, including Jeffrey Webb and several co-defendants, *see* S-

1 ¶¶ 124-35, engaged in similar kinds of corrupt behavior between 2011 and 2015.  It is

here that Mr. Takkas, as described above, is alleged to have a (peripheral) role in one of

the charged schemes.  But going well beyond this single scheme, the government alleges

schemes involving bribery for the FIFA presidency (S-1 ¶121), bribery involving soccer

media and marketing rights associated with far-flung schemes (S-1 ¶¶125, 133, 138), and obstruction of justice (S-1 ¶¶ 140-41).  As mentioned, the government itself alleges some fifteen distinct criminal schemes took place during this 25-year period.  The schemes can be grouped into five categories: (1) those involving media and marketing rights to national and international soccer tournaments[10] and qualifying matches[11]; (2) those involving media and marketing rights to "friendly" soccer matches[12]; (3) those involving sponsorships of national soccer teams[13]; (4) those involving World Cup hosting rights[14]; and (5) those involving the 2011 FIFA presidential election[15].

In other words, the government alleges a large number of loosely connected schemes separated in kind, time and geography.  Of the fifteen schemes as conceptualized by the government, fourteen have absolutely nothing to do with Mr. Takkas, who is not mentioned once.

---

[10] These include the CONMEBOL Copa America tournament for South American soccer (alleged Scheme A), the CONCACAF Gold Cup tournament for North American, Central American, and Caribbean soccer (alleged Schemes B, L and N), the CONMEBOL Copa Libertadores tournament for South American soccer (alleged Schemes C and D), the CBF Copa do Brasil tournament for Brazilian soccer (alleged Scheme E), and the CONMEBOL/CONCACAF Copa America Centenario tournament (alleged Scheme O).

[11] In addition, the government alleges two schemes associated with World Cup qualifying matches in the CFU (Schemes G and M) and UNCAF (Scheme I) regions. The latter is separated into five parts for each of the national-federation media/marketing contracts allegedly obtained through bribery (Costa Rica, Nicaragua, Honduras, El Salvador, Guatemala, and Panama).

[12] This is the alleged UNCAF region friendlies scheme (Scheme J), which is separated into three parts for each of the national-federation match contracts allegedly obtained through bribery (El Salvador, Guatemala, and Costa Rica).

[13] This is the alleged CBF sportswear sponsorship scheme (Scheme F).

[14] This is the alleged 2010 FIFA World Cup host country vote scheme (Scheme H).

[15] Scheme K.

**ARGUMENT**

A. <u>Principles Governing Severance</u>

Rule 14 of the Federal Rules of Criminal Procedure recognizes that joinder, even when appropriate under Rule 8(b), may prejudice either a defendant or the government. Rule 14 provides:

> If the joinder of … defendants in an indictment … appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a).  The trial court has "almost unlimited discretion" to determine whether there is sufficient prejudice to warrant severance.  *United States v. Gallo*, 668 F. Supp. 736, 748 (E.D.N.Y. 1987) (Weinstein, J.) (granting severance in multi-defendant case and citing U.S. Supreme Court and Second Circuit cases on relevant standard), *aff'd*, 863 F.2d 185 (2d Cir. 1988); *see also United States v. Graham*, 477 Fed. Appx. 818, 821 (2d Cir. 2012) ("Motions to sever under Rule 14 are committed to the sound discretion of the district court") (citation omitted); *United States v. Cardascia*, 951 F.2d 474, 483 (2d Cir. 1991) (noting that a district court's Rule 14 decision is "virtually unreviewable" on appeal (quoting *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir. 1988)).

Further, while we recognize that joint trials are generally favored as they tend to promote judicial economy, *see Zafiro v. United States*, 506 U.S. 534, 540 (1993), such countervailing concerns do not automatically warrant joinder.  As the Second Circuit pointedly observed many years ago:

13

> [W]e do not accept the proposition that because of the
> convenience of the Government, the conservation of judicial
> energy and the expense of multiple trials, the discretion of the
> United States Attorney in indicting numerous defendants . . .
> should be unfettered.  There can be no litmus paper test
> depending upon the number of defendants and the expected
> length of trial.  Rather the inquiry must be whether the
> defendants in this case . . . [will be] afforded a fair trial.

*United States v. Moten*, 564 F.2d, 620, 627 (2d Cir. 1977).  The Court in *Moten* echoed

similar comments by Judge Weinfeld in *United States v. Kahaner*, 203 F. Supp. 78

(S.D.N.Y. 1962), decided long before the earliest of the allegations in this case:

> [A] single joint trial, however desirable, may not be had at the
> expense of a defendant's right to a fundamentally fair trial.
> Economy of judicial manpower and the prompt trial of those
> accused of a crime must be weighed against possible
> unfairness to a defendant.

*Id.* at 81; *see also United States v. Figueroa*, 618 F.2d 934, 944 (2d Cir. 1980) ("[T]here

are limits to the risks a co-defendant must endure" in the name of judicial economy).

Severance should be granted if the defendant is able to show "a serious risk that a joint

trial would compromise a specific trial right of one of the defendants, or prevent the jury

from making a reliable judgment about guilt or innocence."  *Zafiro*, 506 U.S. at 539; *see

also United States v. Nicolo*, 421 Fed. Appx. 57, 65 (2d Cir. 2011).  This standard does

not require *proof* of prejudice; rather, it merely requires the defendant demonstrate that

joinder "*appears* to prejudice" him.  *Zafiro*, 506 U.S. at 539 (emphasis added).

 To determine whether severance is appropriate, a court should consider several

factors, including: (1) the number of defendants and the number of counts, *Gallo*, 668 F.

14

Supp. at 748-49; (2) prejudice from evidence admitted against co-defendants that the jury

should not consider against a defendant and that would not be admissible if a defendant

were tried alone, *see Zafiro* 506 U.S. at 539; and (3) whether this "prejudice" is

heightened by any substantial disproportionality in the evidence offered against the

defendants, including a disparity in the quantum of proof, *see United States v. Spinelli*,

352 F.3d 48, 55 (2d Cir. 2003), or the type of proof offered against the defendants, *see*

*Zafiro*, 506 U.S. at 539, or a disparity in the degrees of involvement by defendants in the

overall scheme, *see United States v. Dowtin,* 2012 U.S. Dist. LEXIS 186749 at *6

(E.D.N.Y. 2012); *see generally Gallo*, 668 F. Supp. at 749 (listing factors for courts to

consider when deciding severance motions).

      The Second Circuit has also noted that "severance is required" when "the sheer

volume and magnitude of the evidence against [other defendants] so dwarfs the proof"

against another defendant.  *Spinelli*, 352 F.3d at 55; *see also United States v. Upton*, 856

F. Supp. 727, 736 (E.D.N.Y. 1994) (granting severance).  This is especially the case, as

this Circuit has noted, in so-called "monster" cases involving numerous defendants: the

prospect of a complex, prolonged trial "constitute[s] an enormous burden on the courts,

as well as on defendants, the defense bar, jurors, and even prosecutors." *Gallo*, 668

F.Supp. 736, 754-55; *see also United States v. Casamento*, 887 F.2d 1141, 1151-52 (2d

Cir. 1989) (noting the disadvantages and attendant prejudices associated with "mega-

trials"); *United States v. Wilkinson*, No. 07-CR-570 WMN (D.Md. July 9, 2008) (see

Exhibit A to Affirmation of Gordon Mehler) (judge severed out individual defendants from indictment alleging crimes by corporation).  Similarly, the D.C. Circuit has stated that severance should be granted if the defendant can demonstrate prejudice, such as when "the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other … crimes charged; or [when] the jury may [improperly] cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find."  *Drew v. United States*, 331 F.2d 85, 88 (D.C. Cir. 1964).

These considerations are not exhaustive.  As the U.S. Supreme Court recognized, after providing examples of prejudicial situations that could justify severance, "[t]he risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here."  *Zafiro*, 506 U.S. at 539.

Against this backdrop, this is a clear case for severance—both from the remaining co-defendants and from the racketeering charge.  Mr. Takkas is, at best, a peripheral defendant, who received no "cut" of any funds allegedly transferred for Mr. Webb's benefit, in a much larger indictment spanning a period of around 25 years.  While Mr. Takkas is charged in the racketeering count, the alleged conduct for which he is charged not only spanned a far shorter period than the period covered by the indictment, but is geographically limited and entirely unrelated to the allegations against either the remaining co-defendants.  *See United States v. Burke*, 789 F.Supp.2d 395, 397 (E.D.N.Y.

16

2011) (granting severance due to "qualitative differences in the charges" against co-defendants).  This is, in other words, a situation indistinguishable from that confronted in *United States v. Branker*, in which the Second Circuit overturned convictions for the district court's failure to sever both counts and defendants in an 81-count indictment, one where the Court remarked that "we are not aware of any such case in which the number of counts even approached the number involved here." 395 F.2d 881, 887 (2d Cir. 1968). There, in finding clear prejudice, the Court noted:

> This kind of prejudice is particularly injurious to defendants who are charged in only a few of the many counts, who are involved in only a small proportion of the evidence, and who are linked with only one or two of their co-defendants. The jury is subjected to weeks of trial dealing with dozens of incidents of criminal misconduct which do not involve these defendants in any way. As trial days go by, the mounting proof of the guilt of one is likely to affect another.

*Branker*, 395 F.2d at 888 (citing numerous cases); *see also United States v. Ramos*, 2009 WL 1619912, at *1–*2 (severing newly added from older counts on grounds of prejudice because the "new counts … expand temporally and substantively to a significant degree the scope of the matters to be tried …. [which has the improper] potential for jury confusion, or improper propensity inferences"); *United States v. Menashe*, 741 F.Supp.1135, 1138–39 (S.D.N.Y. 1990) (severing defendant from both co-defendants and a conspiracy count because of disparities in alleged mens rea); *United States v. Jones*, 16 F.3d 487, 492 (2d Cir. 1994) (citing cases for the proposition that courts will often sever ex-felon counts from other charges on grounds of prejudice).

17

B.    Massive Spillover Prejudice Against Mr. Takkas Will Ensue

The enormity of the superseding indictment itself demonstrates why Mr. Takkas should not be tried with the three remaining co-defendants or the RICO count.  Fourteen of the fifteen alleged conspiratorial schemes (by the government's reckoning) have nothing to do with Mr. Takkas[16], an unofficial bit player on the international soccer scene.  The counts against Mr. Takkas are limited in scope, time and geography.  Thus, if Mr. Takkas is tried separately from these co-defendants, the jury would *never* hear evidence pertaining to the allegations of wire fraud and money laundering (and their respective conspiracy charges) associated with media and marketing schemes of presidents and high-ranking officials of irrelevant international soccer organizations, including the South American soccer confederation (CONMEBOL), the Brazilian soccer federation (CBF), the Guatemalan soccer federation (FEDEFUTG), the Nicaraguan soccer federation (FENIFUT), the Honduran soccer federation (FENAFUTH), the Salvadoran soccer federation (FESFUT), and the Panamanian soccer federation (FEPAFUT).  These are organizations with which Mr. Takkas had no notable contact whatsoever.  Such evidence, of course, would be inadmissible against Mr. Takkas if he were tried alone.  Similarly, the jury would not hear allegations regarding the 2011 FIFA presidential election, unlawful procurement of naturalization, tax crimes, and obstruction of justice, because, simply put, those charges have nothing to do with Mr. Takkas.  Moreover, the discovery produced by the government supports our argument for

---

[16] *See* text accompanying *supra* notes 10-15.

severance.  With tens of millions of documents and hours upon hours of tape recordings, it appears that well over 99% does not even involve Mr. Takkas.[17]

As can be clearly seen, this is a case of manifest unfairness. In a mass, joint trial, an enormous amount of prejudicial matter will come into evidence—including direct and circumstantial evidence of actual solicitation and receipt of bribes and kickbacks for the personal benefit of the recipients regarding schemes far afield in scope, time, and geography from the one alleged against Mr. Takkas—which would be inadmissible if Mr. Takkas is tried separately.  This disparity, by itself, merits severance.  *Cf. United States v. DiNome*, 954 F.2d 839, 844-45 (2d Cir. 1992) (concluding defendants, who had been denied a severance, were improperly "swamped by [a] mass of irrelevant evidence").

In 2014, Judge Allyne Ross used similar principles to sever three defendants, including our client, from a RICO count due to "the gross disparity in the quantity and venality" of the evidence against two other defendants. *United States v. Asaro*, No. 14-CR-26 ARR (E.D.N.Y. August 20, 2014) at 6 (quoting *Gallo*).[18]  Judge Ross wrote that if "inflammatory details were admitted on a joint trial of all counts, their prejudicial effect on the other defendants would be substantial." *Id*. at 8. This clearly holds true for Mr. Takkas in the instant case for the reasons previously described.

C.  <u>That Massive Prejudice to Mr. Takkas Cannot Be Cured By Limiting Instructions</u>

Limiting instructions will not abate the massive prejudice that Mr. Takkas will

---

[17] The *Branker* Court noted that stark disparities in evidentiary quantity are relevant to the severance question. There, the Court stated that "[c]ounsel for [the prejudiced defendants whose convictions were overturned] estimate that fewer than 150 pages of the nearly 7000 page transcript contain testimony relating to each of their clients." See *Branker*, 395 F.2d at 888.

[18] Judge Ross's opinion is attached to the Affirmation of Gordon Mehler as Exhibit B.

suffer from a joint trial with the remaining co-defendants and the overstuffed RICO count.  As a general rule, it is difficult for a jury to follow limiting instructions and compartmentalize all of the independent evidence in a case, focusing only on the non-hearsay, non-excluded evidence as to each defendant and each charge.  Limiting instructions are particularly dubious, however, in cases like this one, which contains voluminous evidence having "some probative value as to a defendant, but which would be excluded under Rule 403 in a separate trial."  *Gallo*, 668 F. Supp. at 753.  To expect a jury to fairly sift through the enormous volume of proof that will come in regarding the co-defendants, over 25 years and in completely unrelated areas of the globe, is a pipe dream.  *Cf. United States v. Delatorre*, 522 F.Supp.2d 1034, 1054 (N.D. Ill. 2007) (granting severance in "complex" multi-conspiracy case because "[e]ven with the clearest limiting instructions, it would be unreasonable to expect the jury to be able to separate out the evidence and connect it to the appropriate defendants for each different conspiracy"), *aff'd*, 436 Fed. Appx. 639 (7th Cir. 2011); *United States v. Farano*, 749 F.3d 658, 661 (7th Cir. 2014) (noting severance is especially likely to be appropriate in a "complex case with many defendants, some of whom might only be peripherally involved [because] the bit players may not be able to differentiate themselves in the jurors' minds from the stars").

D.     Severing the Co-Defendants and the RICO Count Will Promote the Efficient
       Administration of Justice.

In order to qualify for severance, a defendant must show that the prejudice to him from joinder is severe enough to outweigh the judicial economy that is often realized by avoiding multiple trials.  *See United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998); *see also Delatorre*, 522 F.Supp.2d at 1054-55 (noting that by severing case involving RICO, murder, and drug conspiracies, "the length of service for each jury will be reduced as the government's presentation of evidence will be more streamlined and focused in each trial, and the smaller number of attorneys will reduce the amount of argument and cross-examination").  Here, a separate trial of Mr. Takkas will actually promote judicial economy.  It will avoid the real possibility of a mid-trial mistrial due to prejudice resulting from voluminous evidence admitted against the co-defendants, with the consequent waste of judicial resources.  And it will be a *much* shorter trial.

This is not an instance where, if the Court severed Mr. Takkas, the same case would be tried twice.  It is unlikely that all, or even most of, the same witnesses would be called to give the same testimony in separate trials.  The remaining co-defendants, major players in international soccer, have cases that are completely unrelated to that of Mr. Takkas.  *See Delatorre*, 522 F.Supp.2d at 1057 (severing trial in a way that "groups the alleged leaders of the conspiracy together in one trial, and [lesser] players together in a second trial").  The only thing they have in common is that they all relate to international

soccer.  The government cannot argue that there is substantial cross-over of witnesses in cases that take place on completely different continents involving completely different soccer federations run by completely different people and occurring at completely different times.  A trial against Mr. Takkas, without co-defendants or the bloated RICO charge, would likely last several days, as opposed to many weeks without the severance.

## **CONCLUSION**

For the reasons set forth above, a severance of Mr. Takkas from his remaining co-defendants, and from the elephantine RICO count, is in the interests of justice, as it would best afford him his constitutional right to a fair trial.  Therefore, we respectfully urge this Court to exercise its discretion to grant Mr. Takkas the severance requested.


Respectfully submitted,


_____
/s/
Gordon Mehler

MEHLER LAW PLLC
747 Third Avenue, 32nd Floor
New York, NY 10017
(212) 661-2414
gmehler@mehlerlaw.com


Dated: January 31, 2017

23

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 31st day of January 2017, I electronically filed the foregoing notice of motion and the accompanying memorandum with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all parties.


Dated: January 31, 2017


Respectfully submitted,


_____  /s/

Gordon Mehler
*Attorney for Defendant Costas Takkas*

24