1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,          ) Criminal
                                   ) No. 15-252 (PKC)
                 Government,       )
                                   ) MOTION HEARING
    vs.                            )
                                   ) Brooklyn, New York
    JEFFREY WEBB, et al.,          ) Date:  April 6, 2017
                                   ) Time:  10:00 a.m.
                 Defendants.       )
_____

TRANSCRIPT OF MOTION HEARING
HELD BEFORE
THE HONORABLE JUDGE PAMELA K. CHEN
UNITED STATES DISTRICT JUDGE
_____

A P P E A R A N C E S

For the Government:        Sam Nitze, AUSA
                           Kristin Mace, AUSA
                           Keith Edelman, AUSA
                           United States Attorney's Office
                           Eastern District of New York
                           271 Cadman Plaza East
                           Brooklyn, New York  11201
                           718-254-6328

(Appearances continued on next page)

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
_____

Court Reporter:            Annette M. Montalvo, CSR, RDR, CRR
                           Official Court Reporter
                           United States Courthouse, Room N375
                           225 Cadman Plaza East
                           Brooklyn, New York  11201
                           718-804-2711

2

```
 1   APPEARANCES:   (Cont'd)

 2   For Defendant (4)         Gordon Mehler, Esq.
     Costas Takkas:            Law Offices of Gordon Mehler, PLLC
 3                             747 Third Avenue, 32nd Floor
                               New York, New York  10017
 4                             212-527-7503

 5   For Defendant (8)         Charles Stillman, Esq.
     Jose Maria Marin:         James Alfred Mitchell, Esq.
 6                             Stillman & Friedman, P.C.
                               425 Park Avenue, 26th Floor
 7                             New York, New York  10022
                               212-223-0200
 8                                   -and-
                               Julio C. Barbosa
 9                             Barbosa Legal
                               407 Lincoln Road PH-NE
10                             Miami Beach, Florida 33139
                               305-501-4680
11
                               Florian Miedel, Esq.
12   For Defendant (20)        Miedel & Mysliwiec, LLP
     Hector Trujillo:          111 Broadway, Suite 1401
13                             New York, New York  10006
                               212-616-3042
14                                   -and-
                               Joshua Paulson, Esq.
15                             25 Broadway, 9th Floor
                               New York, New York  10004
16                             646-760-5535

17   For Defendant (22)        A. John Pappalardo, Esq.
     Juan Angel Napout:        Greenberg Traurig, LLP
18                             One International Place
                               Boston, Massachusetts  02110
19                             617-310-6000
                                     -and-
20                             Silvia Piñera-Vazquez
                               Piñera-Vazquez Law Firm
21                             1900 SW 3rd Avenue
                               Miami, FL 33129
22                             305-443-0629

23   For Defendant (23)        Bruce Udolf, Esq.
     Manuel Burga:             500 East Broward Boulevard
24                             Suite 1400
                               Fort Lauderdale, FL 33394
25                             954-858-8831
```

3

1           (WHEREUPON, commencing at 10:12 a.m., the following

2    proceedings were had in open court, to wit:)

3           THE COURTROOM DEPUTY:  Criminal cause for motion

4    hearing, Docket 15-CR-252, *United States v. Webb, et al.*

5           Will the parties please state their appearances for

6    the record.

7           MR. NITZE:  Sam Nitze, Kristin Mace, and Keith

8    Edelman for the United States.  Good morning, Your Honor.

9           THE COURT:  Good morning.

10          MR. PAPPALARDO:  John Pappalardo and Silvia

11   Piñera-Vazquez for Mr. Napout.

12          THE COURT:  Good morning.  Nice to see you again.

13          MR. STILLMAN:  Good morning.  Charles Stillman, Jim

14   Mitchell, and Julio Barbosa for Mr. Marin.

15          THE COURT:  Good morning.  Good to see you again.

16          MR. UDOLF:  Good morning, Your Honor.  Bruce Udolf

17   on behalf of Mr. Manuel Burga.

18          MR. MIEDEL:  Good morning, Your Honor.  Florian

19   Miedel on behalf of Hector Trujillo.  My cocounsel Joshua

20   Paulson will be here in just a couple minutes.

21          THE COURT:  Good morning.

22          MR. MEHLER:  Good morning.  Gordon Mehler on behalf

23   of Costas Takkas, who is here.

24          THE COURT:  Good morning to you, and to you,

25   Mr. Takkas.

4

1          All right.  So as everyone knows, we are here for

2     oral argument on a couple of different motions, primarily five

3     of the defendants, all five defendants' severance motions, and

4     then also Mr. Napout's speedy trial motion.

5          Before we start, I have been asked by the court

6     reporter to remind all defense counsel to reidentify yourself

7     every time you stand up because there's so many of you, it

8     will be impossible for her to keep track of who's speaking in

9     that moment.

10          Now, let me just set the stage a little bit, having

11     obviously read all of the papers.  Four of the five defendants

12     are seeking to sever his trial from the other defendants, and

13     then Defendant Takkas is also seeking to sever not only his

14     trial from the other defendants, but also his trial on the

15     RICO conspiracy charge from the money laundering and wire --

16     the wire and money laundering conspiracy charges against him.

17          And as I said before, Defendant Napout is also

18     seeking a speedy trial or speedy trial relief, I presume

19     namely to have his trial as soon as possible.

20          Now, I am going to give all the parties an

21     opportunity to speak and to make all the arguments you want,

22     but I want you to understand that as I see it, all of these

23     severance motions coalesce around the same principles, the

24     same legal principles and much of the same case law.  And

25     they're really identical in kind, though different in

5

1    specifics.  To me, they are variations on a theme, to put it

2    simply.  So I want you to avoid rehashing arguments made by

3    your cocounsel, especially about core legal principles, such

4    as prejudicial spillover, antagonistic defenses, or anything

5    in that nature.  Rest assured, I am aware of the case law,

6    you've cited it in your briefs, and you should focus your

7    arguments on the specifics relating to your particular client.

8            I know that many of you have made the argument that

9    the evidence that will be produced as to your particular

10   client is dwarfed by the evidence that will be produced in

11   relation to other defendants.  So try to be as specific as

12   possible.

13           Now, I see, and I want to tee this up for everybody,

14   the largely determinative issue to be, with respect to the

15   severance motions, and I have to be honest, I don't think it

16   was sufficiently addressed, at least to my mind, by the

17   defendants, even in their reply papers.  It's the argument,

18   obviously, that the government makes, which is that every

19   defendant is charged in this RICO conspiracy.  And it is

20   pretty much black letter law that the government is entitled

21   to put in evidence to prove that conspiracy, which could

22   entail evidence that doesn't relate directly to conduct

23   committed by an individual defendant.

24           So in that regard, I want to read for you a section

25   from *US v. DiNome*, D-i-N-o-m-e, Second Circuit case, I know

6

1    that you are all familiar with, from 1992, 954 F.2d 839.  And,

2    specifically, I am reading a very short passage from page 843

3    in the reported decision.

4            And there the Second Circuit noted, and I think

5    this, for me, is the central issue that the defense has to

6    deal with, and it is certainly at the heart of the

7    government's opposition to severance.  The Second Circuit

8    says:  We note here that the government must prove an

9    enterprise and a pattern of racketeering activity as elements

10   of a RICO violation.  It then, of course, cites 18 USC

11   1962(c).

12           Come on in.  Is this your cocounsel, Mr. Miedel?

13           MR. MIEDEL:  Yes.

14           THE COURT:  Okay.  Let's pause for a moment.  Please

15   state your name for the record.

16           MR. PAULSON:  Joshua Paulson.

17           THE COURT:  Good morning, Mr. Paulson.  Have a seat.

18           MR. PAULSON:  My apologies for being late.

19           THE COURT:  As I have advised all the other counsel,

20   if you stand up to speak, just identify yourself for the court

21   reporter so she can keep track of everyone.

22           So then *DiNome* goes on to say:  Proof of these

23   elements, namely the RICO violation, may well entail evidence

24   of each -- I'm sorry, may well entail evidence of numerous

25   criminal acts by a variety of persons, and each defendant in a

7

1    RICO case may reasonably claim no direct participation in some

2    of those acts.  Nevertheless, evidence of those acts is

3    relevant to the RICO charges against each defendant, and the

4    claim that separate trials would eliminate the so-called

5    spillover prejudice is at least overstated, if not entirely

6    meritless.

7            That is your task on the defense side, is to

8    distinguish that general proposition, because that is a

9    situation that all of you face here.  All five defendants, as

10   you know, are charged in one overarching RICO conspiracy.

11   And, thus, the government, although I don't necessarily agree

12   with how far that principle can always go, but the government

13   certainly is entitled, if not required, to introduce evidence

14   to establish both the enterprise and the pattern of

15   racketeering activity.

16           I agree with the defense that the scope of how much

17   information can come in in that regard has to be reasonably

18   limited, so as to not to create prejudice to the defendants.

19   But how do you justify separating yourselves from the other

20   four defendants, if there is such a RICO conspiracy, and if at

21   every trial on this RICO conspiracy charge the government is

22   allowed to introduce evidence of a pattern of racketeering,

23   which could well entail evidence about crimes in which your

24   client was not involved?

25           So I would like you to focus on that, and explain to

8

1  me how you can overcome that general principle.  And,

2  obviously, everything else you want to argue.

3          Now, unless the defense counsel has agreed upon an

4  order of argument, here's the one that I would like to follow.

5  I would like to start with the attorneys for Mr. Trujillo,

6  followed by the attorneys for Mr. Marin, next Defendant Burga,

7  in part because he joined in Defendant Marin's motion, as well

8  as added some supplemental argument, to be followed by the

9  attorney for Mr. Takkas, who, as I mentioned, is the only one

10  who's seeking to sever not only as to the other defendants,

11  but also as to his individual counts from the RICO count.  And

12  then last, but not least, the attorneys for Mr. Napout,

13  because they are arguing not only severance, but also speedy

14  trial.

15          So unless that upsets an agreement that you all

16  have, that's how I would like to proceed, and I think that

17  will help me keep my briefs separate as well.

18          All right.  So with that, Mr. Miedel or Mr. Paulson?

19          MR. PAULSON:  Yes, Your Honor.  Thank you.  Joshua

20  Paulson for Mr. Hector Trujillo.

21          Judge, without, of course, rehashing everything

22  that's been in the briefs, I do want to simply point out that

23  we've been watching the RICO statute for years being pushed

24  further and further from the original purpose it had of

25  prosecuting organized crime within the United States.  And

1    we've never seen something quite like this, I don't think.

2          The point that I think we've all raised in the

3    briefs isn't to try to seek dismissal of RICO at this stage,

4    because this is a fact based problem that I think will be

5    determined at trial, and I think we can probably reasonably

6    anticipate a number of Rule 29s on this issue at trial.

7    However, we believe that particularly with respect to

8    Mr. Trujillo, the government is using the RICO charge to

9    simply get around Rule 403.  We submitted a couple of cases to

10   that point in our brief, particularly the reply.  But the

11   question really isn't whether or not the government is

12   technically allowed to introduce evidence of the larger RICO

13   conspiracy against Mr. Trujillo, it is how much of that would

14   they be allowed to introduce if the trials were severed or,

15   for example, as a hypothetical thought experiment, if

16   Mr. Trujillo were the last defendant standing, what RICO

17   evidence of CONMEBOL would the government be introducing at

18   his trial.  We submit that it would be very little, if any, at

19   all.

20          They're arguing a very substantial international

21   conspiracy over many years.  To connect it to Mr. Trujillo,

22   they really only need to introduce the fact that there was a

23   conspiracy of which he was a part.  They have not alleged any

24   association whatsoever between Mr. Trujillo and the CONMEBOL

25   conspiracy, the CONMEBOL defendants, and that's going to be

1   the bulk of this joint trial.

2          We may have weeks or months of listening to hundreds

3   of hours of recordings, millions of pages of documents, that

4   simply have nothing to do with Mr. Trujillo.  The evidence

5   against him is very limited.  It is concise, there are, I

6   believe, four or five documents, total, that the government

7   submitted with respect to its bill of particulars that are

8   tainted documentally to Mr. Trujillo.  The conspiracies of

9   which he is alleged to be a part are simply very, very limited

10  and completely unrelated to those of the remaining defendants.

11         THE COURT:  Well, let me ask you a question, in the

12  vein of a thought experiment.  Let's imagine Mr. Trujillo's

13  just going to trial by himself, as you posit.  What evidence

14  of the RICO conspiracy would you think is both sufficient and

15  not overly prejudicial or overly broad?

16         MR. PAULSON:  If the government wished to introduce

17  limited evidence that the conspiracy extended throughout South

18  America, they could certainly do that.  They could do that

19  without introducing millions of pages of documents.  They

20  could probably do it with one or two witnesses over the course

21  of a couple of hours.  Likewise --

22         THE COURT:  Some summary witnesses?  Some kind of

23  summary witness?

24         MR. PAULSON:  Yes, Your Honor.  And they could

25  certainly introduce the facts from their cooperators from

1   Traffic, Media World, whichever these other organizations are

2   that were involved in some kind of larger aspect of the

3   conspiracies, but it wouldn't take us months, Your Honor, it

4   would take us a day or two.

5          The evidence that they have related to the CONCACAF

6   conspiracies, the World Cup qualifying matches, which would be

7   much more relevant to their case against Mr. Trujillo, would

8   certainly be allowable, and that still goes beyond

9   Mr. Trujillo's direct participation because he had nothing to

10  do with CONCACAF.  However, it puts his facts within that

11  larger scope of the supposed RICO conspiracy.  But, again, we

12  are talking about a very limited number of hours of RICO

13  evidence outside of the specific conspiracy that he's alleged

14  to be a part of.

15         THE COURT:  Okay.  Continue.  I didn't mean to

16  interrupt you.

17         MR. PAULSON:  Those are the primary points,

18  Your Honor, unless Your Honor has additional questions.  But

19  we simply feel that the scope of Mr. Trujillo's alleged

20  participation is really such that his trial is going to be

21  completely consumed by evidence, which if he were tried

22  separately, would not be admissible under Rule 403 because it

23  would be cumulative, it would be prejudicial, and the simple

24  fact that he's charged as part of the same RICO conspiracy

25  would not allow him in a separate trial to sit through

12

1    hundreds of hours of evidence against the CONMEBOL defendants.

2    That can be established much more concisely, much more

3    briefly, and saving judicial economy.

4              THE COURT:  All right.  Thank you very much.

5              Next we have the attorneys for Mr. Stillman.  Yes?

6              MR. STILLMAN:  Yes, Your Honor.  Good morning.

7              THE COURT:  Good morning.

8              MR. STILLMAN:  I guess if I could put on

9    Mr. Paulson's glasses and change my hair, I could get up and

10   say kind of the same things that he was just saying to you,

11   Your Honor.

12             THE COURT:  No facelift needed, or whatever it is

13   you are envisioning.

14             (Laughter.)

15             MR. STILLMAN:  I'll have to defend the ground that I

16   am stuck with.

17             But, Your Honor, in your opinion denying our motion

18   to dismiss, you said the global conspiracy alleged in Count 1,

19   I think I got it right in my notes here, has a different scope

20   and different objectives than the conspiracies alleged in the

21   other counts of the indictment, and you went on to say,

22   therefore, it is not duplicitous.  It was a duplicity

23   argument.

24             But what I am concentrating this morning on,

25   Your Honor, is the notion of just that very point, that the

1   global conspiracy, the global RICO, I will call it the global

2   RICO conspiracy, has a different scope.  We know that, it is

3   decades of proof, it's taken 236 pages to spell it all out.

4   And then when you talk -- when you speak of the different

5   objectives in the smaller conspiracy, well, here we know that

6   if you go through this indictment and through this RICO,

7   there's 99 crimes, 38 conspiracies, I don't know what the

8   number of defendants are, because of the original indictment

9   and the second indictment, the unnamed coconspirators, there's

10  an army of people whom they say are part of this RICO

11  conspiracy.

12          And the case law, and Your Honor obviously points

13  out an important case, Second Circuit case, and the Eastern

14  District has been the fount of a lot of cases in this area,

15  from *Upton* to *Gallo*, I am sure Your Honor knows them all.  And

16  yet when you look at the cases cited -- I have it right here.

17  Just give me one split second, Judge.  *Upton*.

18          So in *Upton*, you know, your colleague Judge

19  Glasser -- it was not RICO, okay, it was conspiracy, but,

20  nevertheless, he was confronted with this same kind of

21  situation.  And what Judge Glasser saw was that with respect

22  to at least two of the defendants, they just didn't belong.

23  It wasn't right to put them into the bigger case, and he

24  severed them.  You know, the judge granted the motion to

25  sever, and others tried to get out, and he said, "No, you

14

1    can't get out."  And I think that this really is a kind of a

2    carry-on, if you will, from what my colleague Mr. Paulson was

3    talking about.

4          Your Honor asked him what would happen if this case

5    was United States v. Jose Maria Marin, everybody else had

6    disappeared, and I am not saying anything other than they are

7    not there.  And I know I can say the same thing, they may get

8    up and argue with me about it --

9          THE COURT:  Under my rules they can't do that.

10          MR. STILLMAN:  That's good.

11          To a moral certainty, the trial of United States v.

12   Jose Maria Marin on this very same indictment would be a much

13   shorter, smaller, tighter, their view of RICO would be a

14   narrower view of what this RICO thing was, that if we go to

15   this joint trial and Marin is not separated, he's going to be

16   confronted with sitting day after day of evidence having

17   nothing to do with him.  Granted, it has to do with the RICO

18   conspiracy, I get that.  But the spillover, may not be the

19   word that the Circuit likes, but there will be spillover.

20   There will be harm to him, and we can eliminate that harm by a

21   separate trial.

22          THE COURT:  Well, let me ask you a question, since

23   you are the first of the three CONMEBOL defendants who are

24   remaining.  I don't understand how you can argue that you

25   should be severed from the other two CONMEBOL defendants, at a

1    minimum, because you are all charged -- they are all charged

2    with the same smaller subconspiracy, if you will, relating to

3    the Copa America Centenario, and also the Copa Libertadores

4    scheme, too.

5              So as to the other two defendants, Mr. Napout and

6    Mr. Burga, do you really have any kind of a severance

7    argument?

8              MR. STILLMAN:  No.

9              THE COURT:  Okay.  Now you are just arguing as to

10   Mr. Trujillo and also then Mr. -- oh, no, I guess that would

11   be it, just to Mr. Trujillo, really.

12             Okay.  I appreciate that.  So, basically, your

13   argument is similar, which is that all the RICO related

14   evidence would really swamp the case as to your client and

15   confuse the jury.

16             MR. STILLMAN:  Look.  Your Honor -- just one second.

17             (Short pause while counsel confer.)

18             MR. STILLMAN:  What my partner Jim Mitchell points

19   out to me, Your Honor, is that maybe I was too hasty.

20             THE COURT:  I figured there would be some dissent

21   amongst those at this table.

22             MR. STILLMAN:  That's why I bring my lawyer along,

23   you know, to make sure I get this right.

24             What Jim Mitchell points out to me, Your Honor, and

25   I should have pointed out to you, is that, yes, it is true

1  that, you know, that they have the commonalty of CONMEBOL.

2  But the evidence as to participation is not going to be the

3  same.  It is just not.  And I think that that's where I really

4  made my mistake in answering too quickly, Your Honor.

5            And so if you say what is the proof going to be,

6  well, you know, it is going to be the proof that they have, or

7  that they have and they are going to try to offer.  But our --

8            THE COURT:  Well, some of which you have obviously

9  seen through discovery, no?

10            MR. STILLMAN:  Your Honor, to say you have seen

11  things in discovery in this case is to be a pretty hard

12  thing -- there are mountains and mountains of material.  And I

13  would say, up to this point, that very little that I have seen

14  would indicate to me that there's going to be that commonalty

15  merely because they are in the CONMEBOL -- they are CONMEBOL

16  related.  So I don't think CONMEBOL is going to be the tie

17  here, Your Honor.

18            THE COURT:  But you would agree, and, obviously, you

19  have done so many cases you certainly have been in the

20  situation where the evidence against one defendant may be much

21  greater either in volume or quality than against another

22  defendant, but that isn't necessarily enough to justify

23  severance.

24            MR. STILLMAN:  No, it isn't, all the time, and yet

25  there are times, as I say, you know, as Judge Glasser found in

17

1   *Upton*, as he looked ahead to that case, he could see that the

2   evidence with respect to these two defendants, I think they

3   came from Atlanta, there was an Atlanta piece to that case,

4   with respect to that, Judge Glasser said, "No, I don't think

5   they belong here, and I am going to let them out."  And he

6   goes on to say maybe that there will be a plea some day by

7   them.

8           But, nevertheless, so I think the fact that there is

9   going to be more evidence with respect to one than the other

10  is not really the point here.  The point is, look.  What are

11  we struggling for?  We are struggling for what -- a fair

12  trial, right?  And what we know to a certainty is you and

13  Your Honor doing your job, you are going to do everything in

14  your power to see to it that's a fair trial.  And I totally

15  get that and respect it.

16          But my concern is that having Marin, Jose Maria

17  Marin, sitting in the courtroom where mountains of evidence

18  are coming in that really have nothing to do with him, he

19  really faces the specter of just, you know, just being

20  convicted on something that he didn't do, in spite of your

21  best efforts by instructions and all of the other things, and

22  our efforts as lawyers to advocate on his behalf.  And there

23  is a way to avoid that.  Now, it does put more burden on the

24  system.  I totally get that, but, you know, that's what we all

25  get paid to do, you know.

1           THE COURT:  Well, I will leave it to the government

2    to respond to the evidentiary issue you raise because,

3    obviously, you're making it to some extent, by your own

4    admission, in the abstract.  Because you don't know exactly

5    what the quantum of evidence is going to be as to your client,

6    versus Mr. Napout or Mr. Burga, who are similarly claiming

7    that the mountain of evidence will be about some other

8    defendants.

9           So, clearly, there is some truth that applies to

10   these statements or not, and I think the government is in a

11   better position to respond to that.  But you have to

12   acknowledge that your argument about the evidence really is

13   based on a less than complete view of what that evidence will

14   be.

15          MR. STILLMAN:  Well, that's true, Your Honor, except

16   that when I look at the indictment and I see, you know,

17   hundreds of paragraphs and I am only in a half a dozen

18   paragraphs, and I see scores and scores of criminal

19   conspiracies charged, and I am only in a couple of the

20   conspiracies charged, that is a fairly decent signal to me

21   that the weight of the overall evidence is going to be far

22   different with respect to the charge here.  I mean, the weird

23   thing, quite frankly, Your Honor, the strange thing about this

24   situation right now is that you have the five of us here going

25   to trial and an indictment that's got, you know, all this

1    stuff in there, and the people who are all -- they're either

2    going to be witnesses, God knows what we'll find out about

3    them, and so it is kind of a strange moment in this case where

4    the government wants to put in the evidence of 236 paragraphs

5    to these five gents over here.  And what we're trying to do is

6    figure out a way to see to it that we all, each of us,

7    representing our respective clients, get a fair trial out of

8    this, which is, obviously, I know your goal as much as it is

9    ours.

10             THE COURT:  Okay.  Well, certainly I am going to ask

11   the government about how much of the 236-paragraph indictment

12   they intend to put on trial.  I think that's a large part of

13   the equation that we're all grappling with here.

14             So thank you very much, Mr. Stillman.

15             Let's go next to the attorneys for Mr. Burga.

16             MR. UDOLF:  Good morning, Your Honor.  Bruce Udolf

17   on behalf of Mr. Burga.

18             I don't have much to add to what Mr. Stillman just

19   said.  I would point out to the Court that similarly to his

20   client, my client is only mentioned in a few paragraphs of the

21   RICO count as well.  And there's an additional fact in my case

22   because my client has not been extradited on the four other

23   charges that are against him, which are two wire fraud charges

24   and two money laundering charges.

25             THE COURT:  But the obvious response, and the one

20

1    the government gives, is that even so, the evidence about the

2    acts he committed has to be put in as part of the RICO charge

3    against him to show how it is that he actually participated in

4    the activities of the alleged RICO conspiracy.

5              So you don't really get any benefit,

6    evidentiary-wise, from the fact that he was only extradited on

7    the RICO conspiracy, which is obviously the much bigger

8    charge.

9              MR. UDOLF:  Well, Judge, my research isn't, in all

10   honesty, is not complete on that issue so I am not willing to

11   concede that point.

12             THE COURT:  Well, quite frankly, even if you weren't

13   in the case at all, the government might seek to put on that

14   evidence just to show the pattern of racketeering engaged in

15   by the conspiracy that's alleged, even if your client wasn't

16   here and wasn't a defendant.

17             It is hard for me to imagine that now he is a

18   defendant, how that would come out.  That seems even quite the

19   opposite of what should happen.  But you can continue to do

20   your research.  Maybe you'll convince me otherwise.  I just

21   don't see much merit in that argument.

22             MR. UDOLF:  The fact is, though, as Your Honor

23   correctly observed, without undermining Mr. Stillman's

24   argument on this point, I mean, there is a different situation

25   in terms of the CONMEBOL defendants than there are against the

21

1    other defendants in this case.

2            And, you know, part of it is, has to do with the

3    amount of prejudice against my client.  It is clearly a

4    different level of prejudice in admission of acts that were

5    committed and committed by other defendants in connection with

6    the CONMEBOL transactions, than in all the other transactions

7    that are specified, that are set forth with a lot more

8    specificity in the indictment than anything my client did.  As

9    a matter of fact, I can't imagine the allegations against my

10   client being more vague, including some reference to him

11   having agreed to receive in excess of seven figures.  I've

12   seen maybe a total of maybe no more than a dozen documents in

13   this case that have anything to do with my client, out of 12

14   million so far.  Now, admittedly, I have not gone through all

15   the evidence in this case, and there may be others.  But it is

16   really a scant proportion of the evidence.

17           But, you know, the thing is, the government elected

18   to bring this RICO charge, and now they are saying, "Well, we

19   can put all this other junk into evidence because we -- the

20   grand jury has returned an indictment on the RICO charge."

21   But they could just as well have kept it simple and charged

22   Mr. Marin, Mr. Burga, for instance, with the CONMEBOL offenses

23   or CONMEBOL offense.  They elected to do this, and now they

24   are sort of using that as an excuse to let in the kitchen sink

25   and say "We can go into anything."

22

1          But at some particular point, that rises to a level

2     of such prejudice.  And I frankly don't presume to know what

3     evidence there is out there about Mr. Webb, for instance, or

4     all these other individuals, but I presume since he's the

5     first name on the indictment, it is not going to be good, and

6     there's going to be a lot of evidence out there that will not

7     inure to my client's benefit.  And so I'm concerned about

8     that.

9          It may very well be that they may choose to limit

10    the evidence that they make and present in their case in chief

11    as to certain transactions.  They are not required to go to

12    trial on that.  But if they do throw in the kitchen sink, that

13    will severely prejudice my client.

14          When I was a prosecutor, I indicted dozens of RICO

15    cases.  I'm very familiar with the statute and the history of

16    the statute.  And as counsel previously noted, it was

17    originally part of an anti-organized crime package.  I think

18    it was 1970 when it came into being, and it was largely the

19    result of a protege of Robert Kennedy named Robert Blakey who

20    came up with this scheme.  And the whole purpose of it was to

21    allow disparate acts and disparate actors to be taken down in

22    one RICO umbrella.

23          But the reason for it was that even though there was

24    extortion on the one hand, or union fraud on the other hand,

25    they were all related to -- for instance, the Gambino family,

23

1   just to throw out a familiar name, or the Genovese family, to

2   throw out another name.

3          But those were associations-in-fact.  But even if

4   you didn't know all the actors, as you are not required to in

5   most conspiracy cases, you still have a general idea that if

6   you were associated with the family, there was a lot of bad

7   stuff going on.  And it was -- and you had a pretty good

8   reason to believe that you were part of a larger whole, even

9   though you didn't know all the actors.

10         In this particular case, the only commonalty we

11  have, as counsel for the government has correctly noted, is

12  that they all involve allegations of bribery.  Well, you know,

13  there could be all kinds of allegations that are the same.

14  That doesn't mean that they should all be joined under a RICO

15  umbrella.  Just as what if these were involved in -- people

16  involved in, say, the garment industry in South America, where

17  I am given to understand, at least, that it is routine for

18  buyers to accept gratuities, which is a form of commercial

19  bribery.  Commercial bribery is not a defense under most laws

20  that I am aware of in South America, indeed, in the better

21  part of the world.  Indeed, in the better part of the world,

22  it is part of -- an accepted part of doing business.  In the

23  subcontinent of Asia, they refer to it as "*baksheesh*," which

24  roughly translated in our lingo would be "grease," you know,

25  to make the wheels of commerce run smoothly.

24

1          And in this particular case, this was the way of

2   life.  And that's exactly why the Peruvian court refused to

3   grant extradition as to the money laundering and the wire

4   fraud counts, because all of those money laundering counts

5   derivatively, but to the wire fraud count directly, was

6   basically to a commercial bribery offense.

7          And the thing that's counterintuitive about it, and

8   this will be the subject of another motion that we plan to

9   file down the road, is that they sent over the most serious

10  crime, which is based on this same theory, legal theory,

11  basically, either derivatively through money laundering or

12  directly through RICO predicates of mail fraud or wire fraud,

13  of deprivation of honest services fraud, which is, in effect,

14  commercial bribery.

15         The only logical explanation I have for that is they

16  didn't want to get too much in the United States' face, since

17  the United States is a substantial benefactor to Peru, so they

18  basically asserted their sovereignty as to, you know, four

19  throwaway conspiracies, but gave the government their other

20  conspiracy.  And that is one of the bases that I plan to file

21  another motion or that we have agreed to recommend to the

22  Court a briefing schedule on.

23         So it seems to me that the government has chosen its

24  poison by using this RICO statute, which was intended to be an

25  organized crime statute.  Honestly, that's what it was

25

1   intended for.  I know it has been extended far beyond the --

2        THE COURT:  Recognition, in your opinion.

3        MR. UDOLF:  -- applications it was intended for.  I,

4   myself, as a prosecutor have used it for those.  But I don't

5   think I have ever seen a case quite as broad in scope as this.

6   And to think that the RICO statute, the strained acronym,

7   RICO, Racketeer Influenced and Corrupt Organizations, was

8   actually a tribute or an homage to Edward G. Robinson's

9   character in Little Caesar, whose name was Rico, the main --

10  in his breakout role as a gangster.  So that's what it was

11  about.

12        But this relatedness, this pattern, all things that

13  the subsequent more recent case law have said that RICO must

14  be -- there must be some showing of that in order to sustain

15  the RICO charge, there is -- the only pattern is a similarity

16  of crime.  And, indeed, RICO was designed to bring about

17  disparate types of crimes.  And the fact that they are all

18  similar, you know, you can have someone who's in the garment

19  industry that basically pays bribes routinely, that does not

20  mean that everyone in the garment industry, for instance, in

21  Peru, would be part of a RICO conspiracy.  There must be some

22  relationship or some knowledge of that.  And I don't think

23  there is in this case, at least I haven't seen it thus far.

24  And so that's -- I would address Your Honor's concern --

25        THE COURT:  You do realize that you started this off

1    by saying, "I don't have much to add to this."  But I am just

2    going to let you go on.  No, I am not belittling --

3             MR. UDOLF:  It was a long flight up here.

4             (Laughter.)

5             THE COURT:  I know.  You should make it worth your

6    trip.  I understand it.

7             MR. UDOLF:  All right.

8             THE COURT:  I understand your argument.  But a lot

9    of what you say, though, quite frankly, Mr. Udolf, is policy.

10   But the gist of what you're saying, and I think Mr. Paulson

11   was alluding to the same, is that the government having used

12   the RICO statute in what some would say is an unprecedented

13   way, may have to pay the consequences for that in terms of

14   severance of defendants from each other at trial, or in

15   limiting the evidence that they put on to prove this

16   inordinately expansive application of the RICO statute.  Is

17   that pretty much the gist of what your --

18            MR. UDOLF:  Yes.  And the fact is, Judge, if they

19   complain about the need for judicial economy, it would be much

20   more economy, because if they would just try, just as a for

21   instance, the CONMEBOL defendants, I mean, we are talking

22   about, I would think, no more than a week long trial.  What's

23   going to make this trial longer and more complicated is the

24   fact that they have chosen to at least potentially throw in

25   the kitchen sink.

1          THE COURT:  Well, bear in mind that there are two

2     issues here.  One is the evidence that will be submitted as

3     part of the RICO conspiracy proof, and how that affects all

4     the defendants in ways that they say are disproportionate and

5     violate 404, 403, and are unfair, and then there are the, if

6     you will, inter-nesting fights between the defendants, three

7     of whom are in a CONMEBOL related conspiracy specifically

8     relating to two particular events, and then the two other

9     defendants, Mr. Takkas and Mr. Trujillo, who are involved in

10    separate conspiracies from everyone else.

11         So there's two categories of potential prejudice

12    that's being claimed.  I started off the conversation with the

13    broader one, because it does in large part subsume much of

14    what applies to most of the defendants, but certainly as to

15    the CONMEBOL defendants, whom I have already asked the

16    question of how can you separate yourselves from each other,

17    really, and that's the second category.

18         But like I said, I see the issue, and we'll ask the

19    government to respond to this, is having used RICO in this

20    very expansive manner, and I think there's little debate that

21    it is unprecedented and quite unusual the scope of this RICO

22    conspiracy, should there be some consequence, sounds much more

23    punitive than it is intended to be, but should there be some

24    counteractive measure on the other side to ensure that there

25    isn't an unfairness in terms of the quantity, the quality, the

1  volume, I guess quantity, or the disparateness of the evidence

2  that's introduced as to these five defendants, given that we

3  are having a trial of only five of the 27 or so indicted

4  defendants.  That's sort of the main question you are going to

5  have to grapple with.

6           So, Mr. Udolf, did you want to say anything else?

7           MR. UDOLF:  No, I've blabbed on enough.

8           THE COURT:  No, no, it is okay.  I am just making a

9  little bit of fun.

10          All right.  Next we have Mr. Takkas' attorney,

11  Mr. Mehler.  Go ahead.

12          MR. MEHLER:  May I speak from here?

13          THE COURT:  You're very old school.  Yes, you may.

14          MR. MEHLER:  Your Honor, just to focus and pick up

15  on Mr. Udolf's point, the Court in teeing up the issue quoted

16  from the *DiNome* case, which appears on page 14 of the

17  government's brief.  And after that, they cite six cases that

18  sort of prove this point.

19          And when you look up those cases, they are almost

20  identical, except for one difference.  They all involve

21  organized crime, they all involve murder, except for one.  So

22  all six organized crime, in the context that the others have

23  defended it, and five of them relate to murder.  And, again,

24  it makes sense, if you're in a limited geographic sphere, it

25  is not unreasonable to believe.  They know each other, they

1    may know what the others are doing.  Here, my client,

2    Mr. Takkas, is not only not a soccer official, been out of

3    soccer for two decades, he's not even from the same

4    neighborhood, he's not even from the same country, he's not

5    even from the same continent.  And they want to put him in

6    with the others.

7            It was so interesting, and I know -- I don't mean to

8    do anything other than call it to the Court's attention, when

9    you were having the colloquy, you said, oh, there are these

10   three CONMEBOL defendants, so you are really just arguing

11   severance for Mr. Trujillo.  Well, then there's a fifth guy,

12   Mr. Takkas.

13           THE COURT:  Right.

14           MR. MEHLER:  And what's important about Mr. Takkas

15   is, he's not accused of taking any money here.  Webb

16   supposedly took millions.  There's no allegation here that he

17   took anything.

18           THE COURT:  But is there not an allegation that your

19   client was the conduit for about a million dollars worth of

20   bribes that went to Mr. Webb?

21           MR. MEHLER:  That is, in fact, the allegation, and,

22   you know, but, again, if --

23           THE COURT:  There's a bank account identified even.

24           MR. MEHLER:  Yes, Your Honor, but the question here

25   is, should he be -- should he be tried with those bank records

30

1   in a simple trial saying, you know, you -- these moneys came

2   into this account, you know, these are the inferences.  If the

3   client wants to put on a defense, he will.  And that's it.

4   He's not tried based on 38 different schemes over 25 years.

5          I think the Court wants me and wants all of us to

6   focus on specifics, and they call -- because of these

7   activities, they call my client an attaché, as if he was part

8   of some important diplomatic service.  I think "gopher" is

9   really a better word.  That's what he would be.

10          THE COURT:  But a high level gopher.  A million

11   dollars, you don't just entrust that to the man on the Love

12   Boat.  I mean, that's a little different thing.

13          MR. MEHLER:  Well, Your Honor, I would beg to

14   differ.  I would beg to differ.  Mr. Webb, as we pointed out

15   in our brief, is a --

16          THE COURT:  Sad accountant.

17          MR. MEHLER:  -- charming, not Mr. Webb, is not

18   that --

19          THE COURT:  I'm sorry.

20          MR. MEHLER:  But he's a charming man who has really

21   betrayed and fooled everybody, his country, his sport, his

22   family, his colleagues.  And when he gets on the stand, I

23   predict he will betray the government, too, with his lies.

24          I think that, again, my client is from the Cayman

25   Islands, a tiny speck of a country that was ranked 201st out

1  of 209.  There's a couple of soccer organizations that are

2  doing worse, but it is not exactly Chelsea or Arsenal in the

3  Premier League.

4          I think that, you know, Mr. Udolf said the

5  government has elected to use the statute, and they are saying

6  basically, "Tough luck.  We have this statute, ha-ha, we can

7  do what we want."  And the court has said, you know, is it

8  fair?  And Rule 14 really assumes that joinder is proper as a

9  technical legal matter.  But then it is very broad in the way

10  it -- you know, it says basically the court can do anything in

11  order to ensure a fair trial.

12          And I think that it is a rule that allows a very

13  broad remedy.  And, yes, there should be a consequence here

14  for the government, choosing to stretch the RICO statute

15  beyond all -- what ought to be all recognizable limits.  And I

16  end with this, you know, which we cited in our brief, Judge

17  Edward Weinfeld, who sat for so many years on the Southern

18  District bench, said, "A single joint trial, however

19  desirable, may not be had at the expense of a defendant's

20  right to a fundamental trial."  And even *Zafiro*, the latest

21  Supreme Court case on severance, you know, requires merely

22  that the defendant demonstrate that joinder will appear to

23  prejudice him.

24          If my client is in with the others, the danger that

25  he will be swept up in the weeks long, 25-year scope of these

32

1   38 separate schemes, is overwhelming.  He basically stands no

2   chance.  And we are asking this Court to intervene and create

3   a barrier to that, for the purpose of ensuring his fair trial.

4           Yes, Your Honor?

5           THE COURT:  Before you sit down, let me ask you two

6   questions.

7           MR. MEHLER:  Sure.

8           THE COURT:  Isn't the argument that you make so

9   emphatically about how severable Mr. Takkas' situation is,

10  he's in a different continent, a different country, involved

11  in a smaller conspiracy than everyone else, and everyone makes

12  a variation of that argument, isn't that a double-edged sword?

13  Because when you get to trial, isn't the argument that your

14  client is on a different continent, he is involved in a

15  different conspiracy, the evidence as to him is only this

16  small sliver of evidence, relative to the mountains of

17  evidence you have seen at this trial, can't that same argument

18  be used, very effectively at trial, I think, by a good lawyer

19  such as yourself and everybody else sitting around the table,

20  to basically make clear to the jury that there's very little

21  evidence as to everything else the government has as to

22  everyone else, and to keep it straight for the jury?

23          Because this is different in a way from the RICO

24  trials, the mob trials, where they are all in this very

25  closely geographic and familial and friendship relationship,

1    where here, you have a very plausible potent argument that I

2    think any juror would understand, is that Mr. Takkas is in an

3    entirely different continent, he's at the Cayman Islands, he's

4    nowhere near where these CONMEBOL defendants are, maybe he's

5    never stepped foot in South America, isn't that an argument

6    that actually says, we could keep this trial pretty focused as

7    to each defendant, and, moreover, wouldn't the government have

8    that as their main interest in order to have their convictions

9    survive appeal?  Should they convict people, they are not

10   going to want to have a mosh pit of evidence and argue it

11   broadly or sweepingly as to all the defendants in order to

12   preserve any conviction that they obtain.

13          MR. MEHLER:  Well, Your Honor, here I can really --

14   I understand the argument, it is a logical argument, and I

15   guess my only response would be based on experience.  Having

16   had close to 35 years, almost equally in government and

17   defense, you know, one likes to think that a jury getting a

18   limiting instruction will listen to it perfectly.  But, you

19   know, maybe I've become a little too cynical in my dotage.  I

20   think that --

21          THE COURT:  And not even a limiting instruction.  I

22   am not relying on them -- on my instructions, rather, I am

23   relying on all of you to do your jobs as vigorously as you

24   have and make it clear to the jury that there's only this

25   little bit that applies to Mr. Takkas, this little bit that

34

1    applies to Mr. Trujillo, and so on.  And the government,

2    really, to do the same in order to have a viable conviction,

3    assuming they get one.

4         MR. MEHLER:  Well, again, reasonable minds can

5    differ on that.  My own very strong gut, based on, you know,

6    more than a year in weeks in a courtroom, is that that is

7    unlikely to happen.  That if you have jurors going back there,

8    they will say, "That guy, yeah, what was he doing here?  Well,

9    did you hear?  He did this.  It is, you know, and he was

10   associated with the guy Webb who was horrible.  You know, he,

11   obviously -- there must be something.  Why would he" -- and

12   you say, "No, no, that will never happen, they'll make" --

13        THE COURT:  That has to happen as to Mr. Takkas.

14   That I get.  That's the case against him.

15        MR. MEHLER:  Sure, sure.  But he's going to be

16   testifying, you know, more broadly.

17        So, again, reasonable minds can differ.  As a

18   practical matter, I don't see it.  I think the government uses

19   the RICO statute.  Not accusing them of bad faith, I just

20   think it is there, you know, they do it because they can.  You

21   know, it is like climbing Mt. Everest.  It is there, they use

22   it.  It's the nuclear bomb.  It has nothing to do with

23   organized crime, but it really helps you to get a conviction.

24   And that's what we worry about here.

25        THE COURT:  The kitchen sink approach.

1      MR. MEHLER: The kitchen sink.

2      THE COURT: One last question. You cited to me

3  Judge Ross' decision in *Asaro*, A-s-a-r-o. Doesn't that case,

4  though, really dictate an opposite result? Because I think it

5  represents a line of cases, which many of you've relied upon,

6  especially in the mob context, for where severance is

7  appropriate, where you have such a great disparity in the

8  seriousness in the type of crimes that each of the defendants

9  are accused of committing, even though they are part of the

10 same RICO organization or conspiracy.

11      And the government has addressed this point, and I

12 am struck by *Asaro* because Judge Ross, and you rely heavily on

13 her decision, makes clear that the main focus of her severance

14 decision is because the two leaders who were to be tried with

15 the two lessers, if you will, of this organization, had

16 committed or were being charged with murders and attempted

17 murders, whereas the two defendants to whom she did grant a

18 severance had been involved in nonviolent offenses. Isn't

19 that really the more appropriate situation where severance,

20 based on inflammatory or prejudicial in terms of type of

21 crime, the type of crime that jurors can't see beyond, and

22 would tend to sweep everyone into the same bucket, isn't that

23 the more appropriate place for a severance than this one where

24 everyone's accused of bribery, money laundering, wire fraud?

25      MR. MEHLER: Well, I mean, I think that there was a

1  symmetry in the *Asaro* case because in those cases there were

2  charges of violent crime against the one defendant, and then

3  there was an extortion charge against another, which is

4  considered a violent crime as well.  Here you have so-called

5  white collar crimes --

6          THE COURT:  Across the board.

7          MR. MEHLER:  Across the board, and I think that

8  there is also symmetry because the *Asaro* case also involved a

9  situation of a lot of different things going back decades.

10 And I think that Judge Ross felt this was a very -- the guy

11 who was severed, this was a very isolated incident involving a

12 period of time.

13         And the Court said to me, "Well, Mr. Takkas is

14 associated with Mr. Webb, he got the money in."  What if the

15 Court saw -- hears evidence, as I believe it will, that the

16 guy got no money for it?  That's just dumb.  Why are you, if

17 you are participating in a conspiracy to launder money --

18 there were people here, I know there was a guy named

19 Margulies, I believe, was a money launderer.  He charged a

20 percentage, right?

21         There was a relationship, the evidence will show,

22 between Mr. Webb and Mr. Takkas, that was a relationship that

23 went back a long time.  They were proud Caribbeans.

24 Mr. Takkas is originally from England, but, you know, Mr. Webb

25 was sort of an up-and-comer.  There was a lot of pride in that

37

1    community that he might rise to the president of FIFA.  And I

2    think this Court can see that, and I think the evidence would

3    show, that that's what motivated him, this desire to help him.

4           Now, you'll say, "Well, what did he get the money

5    for?"  Well, there's going to be a trial, and there is an

6    explanation for that.  I promise the Court.

7           But, again, I ask the Court --

8           THE COURT:  I can't wait.

9           MR. MEHLER:  -- something's wrong here that

10   everybody who's charged with getting lots of bribes, and this

11   guy got nothing.  That's going to be an interesting trial.

12          THE COURT:  Right.  But that's what trials are for.

13   I mean, I think we are skipping over the main issue, which is

14   I was just trying to say that isn't it true that in most of

15   the cases that have been cited where severance has been

16   granted, it is more on the basis that the prejudice that's

17   alleged or that prompts the severance is really one of the

18   kinds of crime, as opposed to even the evidence, and I know

19   there's been one Judge Glasser case cited to me, but the

20   volume of evidence or the disparate activities involved.

21          In other words, in most of the RICO cases involving

22   the mob, you have different members of the mob or factions of

23   the mob doing all sorts of very separate criminal activities.

24   That's the nature of mob activity, that is part of the reason

25   that the RICO statute was passed, was to try to bring them all

38

1  together in some semblance of an association-in-fact.  I am

2  not necessarily going to enter into this policy debate with

3  Mr. Udolf on that issue, and you'll have your Rule 29, I

4  understand that, as Mr. Paulson said, to make.

5            But I am just trying to get to the point that most

6  of the cases that have been cited to me have to do with the

7  prejudice that emanates from the differences in severity of

8  the crime itself, as opposed to the volume of the crime or the

9  separateness of the activity.

10           MR. MEHLER:  Sure.  And I would say, in response --

11           THE COURT:  Volume of evidence.  Not volume of

12  crime.

13           MR. MEHLER:  I would say that there's a small volume

14  of evidence, and the fact that, you know, there are charges of

15  bribe receiving by others, and, you know, I think the evidence

16  will show that my client got nothing.  The fact that the

17  others are all members of national heads of soccer

18  organizations or the head of CONMEBOL, my client was the

19  general secretary of Cayman Islands soccer two decades ago and

20  has been out of soccer so that they have to use the

21  self-deprecating, self-created word "attaché" to get him in, I

22  suggest that that is a difference of substance and, indeed,

23  severity, that will have real consequences if the Court

24  doesn't step in to help ensure fairness.  Thank you.

25           THE COURT:  Thank you, Mr. Mehler.

39

1          All right.  Next we have the attorney for

2     Mr. Napout, Mr. Pappalardo.

3          MR. PAPPALARDO:  Thank you, Your Honor.

4          If I may, Your Honor, I am not going to go over any

5     of these arguments, but I need to apply the facts as we know

6     them today.  And the other dimension that we have is we are

7     asking for speedy trial --

8          THE COURT:  Yes.

9          MR. PAPPALARDO:  -- so that I am not trying to be

10    repetitious here.

11         As the Court knows, we filed our motion for speedy

12    trial on October 31 of last year, and we are hearing it today.

13    So some of the information contained therein with respect to

14    dates and things like that may be a little off.

15         Your Honor, we have a superseding indictment here

16    with 27 defendants, 92 counts, 15 separate schemes, over a

17    24-year period.  Mr. Napout is in five counts and is alleged

18    to be involved in two schemes.  The important point is that

19    there were no specific factual allegations that we have seen,

20    either in the indictment or based upon any of the discovery

21    we've seen so far, that Mr. Napout agreed to enter into any

22    conspiracy.

23         From the beginning in this case, Your Honor,

24    Mr. Napout has asserted his right to a speedy trial.  From the

25    time of the initial appearance, in fact, before that, he was

40

1   the only one who immediately waived extradition from

2   Switzerland.  He did it as quickly as he possibly could.  At

3   the time of his initial appearance, we even objected to any

4   excludable time because of our insistence upon getting a

5   speedy trial.

6           On every hearing since then, particularly before

7   Judge Dearie -- by the way, this is the second motion for a

8   speedy trial we filed.  We filed one in March of 2016, also.

9           At every hearing we've been on the record opposing

10  any kind of delay trying to accelerate the case as to

11  Mr. Napout.  We contend, Your Honor, that severance in this

12  case for Mr. Napout is necessary to protect his right to a

13  speedy trial.  Absent being joined with codefendants, Napout's

14  speedy trial clock expired on May 4, 2016.

15          THE COURT:  I have to stop you.  I've read your

16  papers, and I've, of course, heard your speedy trial argument

17  once before.

18          There are so many different tolling or exclusionary

19  provisions that seem to apply to Mr. Napout's case, but let me

20  just focus on one, and this is the one I am sort of

21  particularly curious on what your response is.  You have filed

22  on behalf of your client four motions, at least, and I am not

23  even including any of the bail modification motions.  I don't

24  consider those as impeding or delaying in any way the trial in

25  this case.  But you filed a motion to dismiss the indictment,

1    you filed a motion for a bill of particulars, you filed a

2    motion disputing discovery issues, namely a claim of common

3    interest and attorney-client privilege, that was only decided

4    on March 10, 2017, by written order, but that warranted and

5    required an evidentiary hearing and testimony and substantial

6    briefing, and now you are filing a severance motion.  I assume

7    you will also have motions to file in limine, perhaps

8    suppression.

9         With all of that process that you have sought to

10   employ on your client's behalf, which is absolutely your

11   right, if not your duty to do, how can you now turn around and

12   say your speedy trial date would have run back in May of 2016?

13   Every single one of those motions allows me to exclude the

14   time while they are being resolved, or else you wouldn't get

15   to file them if I didn't stop that speedy trial clock.  You

16   have to brief them, the government has to respond, and I have

17   to decide them, after giving you oral argument, which has

18   happened with every motion.  So I just don't understand how

19   you can even make this claim.

20        MR. PAPPALARDO:  It hasn't happened with every

21   motion, Your Honor.  First of all, we filed a motion for a

22   bill of particulars, we didn't argue that case, and you

23   allowed that motion in part without argument.

24        THE COURT:  But we had an argument on the motion to

25   dismiss, which included the bill of particulars.  So I don't

42

1    think I prevented you from arguing that, but be that as it

2    may, you had an argument on the motion to dismiss, which was

3    conjoined with your bill of particulars request.  And I

4    granted your bill of particulars request in part.

5              MR. PAPPALARDO:  Exactly.

6              THE COURT:  Okay.

7              MR. PAPPALARDO:  But, Your Honor, what I would

8    suggest to the Court are two things.  One is, that a motion to

9    dismiss did not delay anything.  There were other motions to

10   dismiss here.  It was a clear motion, yes, you took argument

11   and you denied the motion.

12             THE COURT:  But I think you're missing my point.

13   Every single one of these motions you file under 3161(h)

14   allows me to, as I think is appropriate or else I can't

15   resolve them and you can't brief them adequately, to stop the

16   speedy trial clock.  So I am just quibbling with you about

17   your calculation of the speedy trial time.  If you didn't want

18   to file any motions whatsoever, I guess in theory your time

19   could have stopped.  And then your argument to me is why I

20   made you brief them lockstep with everyone else.  That's a

21   different argument.

22             But you can't actually argue to me as a matter of

23   law that after filing all these motions, your speedy trial

24   time ran back in May of 2016.  That, I think, is simply

25   inaccurate.  If you want to argue that it was incorrect of me,

43

1    or somehow violated Mr. Napout's speedy trial right to make

2    you brief it on a schedule with everyone else, fine, that's an

3    argument.

4           But I think to ignore the fact that the time must

5    stop, I think, in order to give you a fair opportunity to

6    brief the issues that you chose to raise for your client, as

7    you should, I don't think you then get to argue that somehow

8    speedy trial ran back in May 2016.  That just doesn't compute,

9    quite literally, under 3161(h).

10          MR. PAPPALARDO:  Well, Your Honor, I would

11   respond -- I understand the Court's point.  I would

12   respectfully disagree for a couple of reasons.

13          The first is, we did file the motion.  The motion

14   wasn't heard.  We filed it on October 31.  You indicated --

15          THE COURT:  The speedy trial motion?

16          MR. PAPPALARDO:  Yes.  The speedy trial motion.  And

17   you said the government doesn't have to respond until they

18   respond with everybody else.

19          Your Honor, with regard to the motion relating to

20   the attorneys in the common interest privilege, let me point

21   out to the Court one simple thing.  We were asked by the

22   government to provide them with a list of attorneys who

23   represented Mr. Napout.  And we did.

24          We were concerned, because CONMEBOL had indicated,

25   and we received this in writing, that they were going to waive

44

1   the attorney-client privilege.  So when we -- across the

2   board.  No limitations.  Based upon that, and based upon what

3   we asserted was a common interest privilege --

4              THE COURT:  Which Judge Levy denied.

5              MR. PAPPALARDO:  But, Your Honor, based upon that,

6   we had a hearing.  At the beginning of that hearing,

7   Your Honor, I asked the Court to determine what it is we were

8   there to argue.  Because subsequent to CONMEBOL's blank waiver

9   of the attorney-client privilege, they modified the waiver

10  and --

11             THE COURT:  I am not disagreeing with you about any

12  of that.

13             MR. PAPPALARDO:  But that's not on us.  That's what

14  I am trying to say to you.

15             THE COURT:  No, but it doesn't matter if it is on

16  you or not.  You could have obviously waived and said, "Okay,

17  fine, if you are not going to honor a privilege, we are not

18  going to fight it."  But you chose, and I am not saying

19  inappropriately, you have to make whatever strategic decisions

20  you think are correct for your client, you chose to argue that

21  Mr. Napout was entitled to a common interest privilege over

22  the position of CONMEBOL.  Once you did that and you filed a

23  motion, the clock stops, to allow that motion to be heard,

24  under 3161(h).  Why is that not appropriate?

25             MR. PAPPALARDO:  If I may, Your Honor, because in

45

1   that case, again, Your Honor, the blanket waiver of privilege

2   was then superseded so that it didn't include the only thing

3   covered by the common interest privilege we were asserting,

4   which were commercial transactions.  So, quite frankly, there

5   was no need for a hearing because they didn't waive the

6   privilege with regard to commercial transactions.

7          That wasn't our -- the only thing that the common

8   interest privilege touched upon, if it existed at all, was

9   commercial transactions.  Subsequent to their blanket waiver,

10  they said, "Oh, no, no, it doesn't include commercial

11  transactions."  As far as I was concerned, then it's over.

12         THE COURT:  Well, you may disagree with Judge Levy

13  to having a hearing to fully flesh out the issues.  But,

14  again, the principle is nonetheless the same.  The statute

15  provides that time will stop while motions are being briefed

16  and resolved.

17         So, again, your speedy trial argument, your

18  technical argument about violating speedy trial just doesn't

19  hold because there have been periods stopped throughout this

20  case, from the beginning of at least my first encounter with

21  everybody, until now, while all of these motions, the motion

22  to dismiss that you wanted to file, the bill of particulars

23  motion that you did file, the severance motion that you have

24  filed, the time has stopped.  You cannot include that as any

25  kind of violation of speedy trial.

46

1         The minute you say, "I want to file a motion," and
2    the Court, as it should, allows you to do that, we are allowed
3    to stop that clock.  I don't understand how you can say, "I
4    want all this process, and yet I still want my speedy trial to
5    have run over a year ago or almost a year ago."  That's just
6    not accurate under the statute or in terms of the process or
7    the procedure that's been followed in this case, initiated by
8    you, in large part, and some of the other defendants who want
9    to file other motions.

10        And, moreover, I think the case was declared complex
11   from the beginning.  Do you really take issue with that, when
12   you are coming in here and saying it is a 236-paragraph
13   indictment, it involves millions of pages of discovery?  You
14   would concede it is complex, no?

15        MR. PAPPALARDO:  Your Honor, the case was declared
16   complex by Judge Dearie simply based upon the discovery.
17   That's what he said.

18        THE COURT:  Well, I mean, okay, we can revisit it,
19   but has it gotten any less complex, in your mind?

20        MR. PAPPALARDO:  I believe it has, Your Honor.  Most
21   of the defendants have pled guilty.  There are five defendants
22   left.

23        THE COURT:  Who are all arguing it is
24   extraordinarily complex with millions of pages of evidence
25   that can't come in against them.  In order to make that

1   assessment and that argument, you have to go through those

2   millions of pages of documents and read everything the

3   government's giving you.  This case is unavoidably complex.

4   It involves evidence coming in from all over the world.  I

5   understand that some of the provisions to exclude time, toll

6   the speedy trial clock are cabined in by reasonableness in a

7   year time limit.  Understood.  But you have four different

8   ways in which this case has to slow down.  Most of which, if

9   not all of which, inures to the benefit of the defendants.

10          And beyond that, explain to me how your client has

11  been prejudiced by this?

12          MR. PAPPALARDO:  Well, that's a different story.

13  I'll get to that, Your Honor.

14          THE COURT:  Okay.

15          MR. PAPPALARDO:  But the foreign evidence is only

16  for a year.

17          THE COURT:  Understood.  That's what I just said.  A

18  year.  Yes.  I understand.

19          MR. PAPPALARDO:  And we're well beyond that now.

20          THE COURT:  For sure.  I agree with that, and I

21  think the evidence that's come in, that's what you have in

22  front of you, but beyond that we have the overall complexity

23  of this case of you all getting through that evidence.  I

24  don't think anyone would have been happy if after that year I

25  said, "Okay, we are going to trial tomorrow.  You have the

1  evidence, the government's time has run out." Nobody wanted

2  to have a trial in this case within that short amount of time,

3  and then the question becomes, must you go to trial with the

4  rest of the defendants. And that's your argument. Being

5  joined with them has somehow prejudiced your client.

6           MR. PAPPALARDO: It is my argument, Your Honor, that

7  it does prejudice my client based upon two things. One of

8  them is the facial aspects of the indictment, what the

9  indictment specifically alleges, and the other is the review

10 of the discovery that we've received to date as it relates to

11 Mr. Napout.

12          And what I can say to you, Your Honor, is that

13 the --

14          THE COURT: By the way, I should correct myself. It

15 is not 230 paragraphs, it is 500-something paragraphs in 236

16 pages or something like that.

17          MR. PAPPALARDO: Your Honor, we have had -- there's

18 nothing in this indictment, as it relates to Mr. Napout, that

19 suggests that he joined the conspiracy. There's absolutely

20 nothing. In this case, Your Honor, we have seen --

21          THE COURT: Are you switching arguments now to the

22 severance issue, or are you staying on the speedy trial issue?

23          MR. PAPPALARDO: Well, they really go together,

24 Your Honor, because antagonistic defenses, which I will get

25 to, goes to the issue of speedy trial.

1    But the quantum of the evidence, Your Honor -- the

2  evidence is massive.  We've conceded that.  Everybody

3  understands that.  The evidence against Mr. Napout is not.

4  And with respect to that, there are no allegations in the

5  indictment that Mr. Napout was part of the -- part of the

6  conspiracy.  He is -- there are no documents that are referred

7  to in the indictment, there are no overt acts in the

8  indictment, there are no financial documents in the

9  indictment, there's no forfeiture count in the indictment as

10  to Mr. Napout.  There are no comments that explains what it is

11  that he supposedly did to either be part of the conspiracy or

12  how he interacted with his coconspirators.

13    And what it says, Your Honor, what it says is that

14  Mr. Napout agreed with others on one conspiracy to take money

15  and another conspiracy to get money, basically.  And that's

16  what it says.

17         THE COURT:  Are "take" and "get" different?

18         MR. PAPPALARDO:  Yes.

19         THE COURT:  Okay.

20         MR. PAPPALARDO:  In one they are alleging that there

21  was an agreement to get money, which presumably wasn't paid.

22  And in another one, that there was money paid.

23    But there is no wire transfers of money into his

24  bank accounts.  All of the other defendants or many of the

25  other defendants, Your Honor, have an incredible laundry list

1    of evidence that supports what's contained in the indictment.

2    That's not the same for Mr. Napout.  And we've looked at the

3    discovery.  The discovery doesn't help us on that, Your Honor,

4    even with the Court's allowing of the bill of particulars.

5            And for those reasons alone, we would tell you that

6    it is unfairly prejudicial for him to be tried with others.

7    Because it is not a question of whether you can argue and

8    cross-examine witnesses, it is really a question of a jury's

9    perception, and being lumped together in a prejudicial way, in

10   an unfairly prejudicial way, with others, where there's a

11   large quantum of evidence.  That's what we are arguing,

12   Your Honor.

13           The other thing is, you have to look at the

14   antagonistic defense piece of this.

15           THE COURT:  Yeah, I'm interested in this.  Go ahead.

16   Tell me how it's antagonistic.

17           MR. PAPPALARDO:  If you look, Your Honor, at page 13

18   of our brief, where we have detailed for the Court the tapes

19   in this case --

20           THE COURT:  Yeah, I am aware of the one you say is

21   exculpatory.

22           MR. PAPPALARDO:  Well, there are two that are

23   exculpatory, Your Honor.  Those are the only two.  There are

24   147 tapes, containing a total of 113 hours and change of

25   recordings.  Napout spoke six times, for a total, in the

51

1     aggregate, of seven minutes.

2             On those -- on the only two tapes of substance, the

3     first one on May 1, 2014, he basically says, it is there in

4     the brief, Your Honor, he says that "Anybody comes to you

5     saying that I am in on anything, I'm not. And you know that."

6             And the person agrees: "Yes, I know that."

7             "And they are liars." And there's an agreement on

8     that.

9             That's an antagonistic defense, Your Honor.

10            THE COURT: Vis-à-vis who?

11            MR. PAPPALARDO: Vis-à-vis codefendants, Your Honor.

12            THE COURT: But this is not a universe where there

13    was a singular crime that had to be committed by the only two

14    people in the room. He could have not taken a bribe, and the

15    other people took a bribe. He may disagree that a testifying

16    coconspirator said, "Yes, he took a bribe with me," but that's

17    what you cross-examine on. That's not an antagonistic

18    defense. An antagonistic defense is one where the jury has to

19    choose one of the defendants as having done the crime. They

20    could find based on the evidence that you've just cited, or

21    other evidence, that your client didn't commit the crime, and

22    that anyone who says he did is a liar. Flat out. Simple,

23    right? That's not antagonistic. That's challenging the

24    evidence that the government's putting forward.

25            MR. PAPPALARDO: Your Honor, the issue isn't whether

1    he -- somebody's saying he took money.  What they're saying

2    is, that they understand that he was going to take money,

3    which he's -- which he is --

4           THE COURT:  So same thing.  It is not mutually

5    exclusive.  The point is the jury could decide, "You are

6    right.  Somebody may say he agreed to take money, but they are

7    just lying."  It doesn't mean that they have to then choose

8    the person who said he agreed to take money is the only other

9    person.  In other words -- and I don't even know if you are

10   talking about any of the defendants sitting here, which I --

11   actually, it would only have to be the other two gentlemen who

12   are involved in the CONMEBOL conspiracy.  And you haven't said

13   to me that you expect either of them, you know, or the

14   evidence to come out that one of the three of you, or even two

15   of the three of you, had to have done this in order for it to

16   have happened.

17          It seems to me that the theory is some group, either

18   the entire or some subpart of the group, took bribes.  That's

19   not -- that's not antagonistic.  That's just challenging the

20   government's evidence as to whoever says your guy agreed to

21   take money or took money.

22          MR. PAPPALARDO:  Your Honor, I don't know who those

23   other people are, and, certainly, the discovery doesn't

24   provide it.

25          THE COURT:  It doesn't matter.  It is the nature of

1   the claim.  This isn't a zero sum total situation.  Like I

2   said, two people in the room, drugs disappear, one of them has

3   to be the person.  So, therefore, if the two defendants who

4   are in the room go to trial, they have to accuse each other in

5   a way that the jury cannot avoid convicting one of them,

6   right?

7            This is not that situation.  It is more like you

8   guys all sitting around the table and, you know, my deputy

9   says three of you decided to take a bribe.  Well, she could

10  just be wrong.  And it doesn't mean that by virtue of that the

11  other people have to get convicted.  So it is not

12  antagonistic, you know what I am saying, under the law.

13           MR. PAPPALARDO:  Your Honor, with respect to *DiNome*,

14  we argue that in our reply brief, and explain why it shouldn't

15  apply in this case.  But, basically, in that case, what the

16  Court did was, in that case, of course, nobody was asking for

17  a motion to sever.  The Hellmans decided that -- in fact, the

18  court implored them to sever the case, and they wouldn't do

19  it.  And once the RICO conspiracy was dismissed, basically,

20  the case was a mistrial.  And that is what we are looking at

21  here in the context of Napout.

22           You know, Your Honor, in the indictment, there's no

23  evidence that Mr. Napout arranged to receive or got any

24  tainted funds.  He's not alleged to have attended any meetings

25  on or about August 2013, either in Buenos Aires or London,

54

1    like others, that -- or Datisa.

2         There's -- he's not named in allegations detailing

3    the use of any kind of financial institutions in the United

4    States to make payments.  That's not in the indictment.  But

5    it is with others.

6         He's not alleged to have deposited any illicit funds

7    into any account of his or any account, period.  Napout's bank

8    accounts or properties are not listed in the forfeiture

9    portion of the indictment.

10         He's not named as having committed any specific acts

11   of bribes or kickbacks.

12         He was not recorded or intercepted participating in

13   any conspiracy.  In fact, it is exactly the opposite.

14         He's denying involvement more than a year before the

15   original arrest took place in May of 2015.

16         THE COURT:  You're aware, of course, that the

17   government is going to make the contrary argument that that

18   was a false exculpatory statement that is indicative of guilty

19   conscience versus something else.

20         But, I mean, here's my -- I understand your

21   fundamental point, which is that there's a disparity in the

22   volume of evidence that's going to be brought to bear on your

23   client, and, therefore, it is unfair to try him even with his

24   other CONMEBOL defendants, because the jury won't be able to

25   sort out what evidence applies to him as opposed to what

1    evidence applies to not only the CONMEBOL defendants, but all

2    of the other participants in the RICO conspiracy.  I

3    understand your argument.

4         I don't agree with it because I think this happens

5    in cases all the time, that there's going to be disparities in

6    evidence, and that's what your job as the defense attorney is

7    to do at trial, which is to point that absence of evidence,

8    just as you've done quite effectively here, to try to argue

9    that there's no evidence to convict your client on.

10        So that's -- I understand your fundamental point.

11        MR. PAPPALARDO:  I appreciate that, Your Honor.

12   Just let me make one more comment, please.

13        In March of last year, I pointed out, based upon the

14   discovery, that there was only one tape that dealt with

15   Mr. Napout, where he was saying "hello" in front of a crowded

16   elevator.

17        At that point in time the government confirmed that.

18   That's all there was with respect to Mr. Napout.  When we

19   listened to all of the tapes, they failed to identify the

20   exculpatory portion.  So they argued with, you know, with

21   certainty that he was only on one tape.  So if they argue

22   today that it must be false exculpatory because a year before

23   the indictments he must have known about this, I mean, I am

24   sure that they, you know, that's an argument they might make.

25   But we see no evidence of that.  If they had evidence of that,

1    Your Honor, don't you think that would be in the indictment?

2         THE COURT:  Not necessarily.  I mean, you all know,

3    the government doesn't lay all their cards on the table in an

4    indictment, to be sure.

5         MR. PAPPALARDO:  I would like to see some cards,

6    Your Honor.

7         THE COURT:  No, understood.  But bear in mind that I

8    am just taking a wild guess, not based on anything I know.

9    But, obviously, this case is probably going to involve some

10   cooperators who were in the room, and you won't get some of

11   that evidence until later.

12        I understand, this is seemingly -- we can have a

13   whole policy debate led by Mr. Udolf about whether that's fair

14   or not, but I think that might be the reason that some of this

15   evidence -- or you are not seeing all the evidence, put it

16   that way.

17        MR. PAPPALARDO:  Well, as of March, they didn't know

18   about it.  But what I am saying to you, Your Honor, is that

19   the entire case against Mr. Napout is dependent upon

20   cooperating witnesses.

21        THE COURT:  That may well be so.  But that doesn't

22   make it any less potent evidence, right?  It is evidence, to

23   be sure.

24        MR. PAPPALARDO:  No, but, Your Honor, it goes

25   exactly to the heart of severance and unfair prejudice.

1          THE COURT:  No, quite the opposite, actually.  If

2    you have a cooperator who's testifying about two, the same

3    events, or tournaments, the ones that your client and two of

4    the other defendants at the table are charged with, then the

5    efficiency argument really runs in favor of the government.

6    Why have a cooperator testify more than once as to the same

7    three defendants?  That would be inefficient, at least.

8          So cooperator testimony, if you are talking about a

9    person who was familiar with the negotiation for these two

10   tournaments that your client and two other defendants are

11   charged with accepting bribes in connection with, it seems to

12   me they have the better of the argument about why they should,

13   at least those three defendants, should be tried together.

14         But I want to hear from the government.  This is

15   sort of the mysterious question of what evidence does the

16   government intend to prove, at least in categorical terms.

17   Because -- and thank you, Mr. Pappalardo.  I didn't mean to

18   stop you.  I assume you're done?

19         MR. PAPPALARDO:  Thank you.

20         THE COURT:  Let's turn to the government.  Because

21   the big looming question is, how much evidence does the

22   government really intend to put in to prove the RICO

23   conspiracy?  I have given you some idea of my own doubt about

24   the potential overbreadth, given how the government has chosen

25   to apply the RICO doctrine, which is fairly singular and

1  unusual.  It goes well beyond the typical RICO case that we

2  see in this district.  I am not saying it's never been done

3  before.  But the scope of it, geographically and otherwise, is

4  certainly great.

5        So let me just tee this up for you, Ms. Mace.

6        I may well agree with you on the legal principle

7  that because you've alleged a RICO conspiracy, you are allowed

8  to put in all the evidence that would prove the existence of

9  the enterprise, as well as the pattern of racketeering.  That,

10  in theory, is a correct proposition.  But it has prudential

11  limits, right?  You can't do this to the point that it really

12  does deluge the defense with irrelevant evidence about the

13  culpability of the bad acts of other members of this

14  conspiracy.  Would you agree with that?

15        MS. MACE:  Yes, Your Honor.

16        And I think that I want to go right to the heart of

17  the issue, as Your Honor has identified it.  What's the

18  consequence to having charged a broad RICO conspiracy in this

19  way?  And there certainly are consequences.

20        I think the main consequence is that the government

21  faces an enormous burden of proof here.  We have to prove the

22  racketeering conspiracy that was returned in the indictment by

23  the grand jury.  And so counsel for Mr. Takkas says the

24  government just does it because it can.  It charges these

25  broad RICOs because it can.  But, actually, that's not the

1    situation here.  The problem is the nature of the crime.  And

2    that's what the grand jury identified, and the indictment that

3    was returned is based on the type of crime that's at issue

4    here.  And so we don't have a situation where you have little

5    discrete incidents of bribery or corruption, you have

6    something that is a bigger, broader problem.  And that's what

7    the RICO statute was designed to combat.  And so it is charged

8    in that way.

9         THE COURT:  Let me ask you a specific question.  I

10   am only interrupting you because this could easily get very

11   macro as opposed to I want to get a little more micro with

12   you.  There are 15 schemes that have letter names in the

13   indictment.  Is it your intention, and I know that you don't

14   know exactly what case you will put on, to prove the existence

15   of every one of those schemes as part of the RICO conspiracy?

16        MS. MACE:  No, not necessarily.  And so I think

17   what's important is to place us in context or procedurally

18   where we make those determinations.

19        THE COURT:  Okay.

20        MS. MACE:  So right now, where it's a question of

21   just whether there's severance.  And I want to talk a little

22   bit in a moment about the types of cases in which courts grant

23   severance in the RICO context.  But then there's the separate

24   issue, Rule 403, and that's a very real issue, and the

25   government acknowledges that, and that's something that we

1    will address to the Court, and I think that's basis of a

2    separate motion to say, "Okay, here we have, these are the

3    defendants going to trial.  We have five defendants."  And how

4    are we going to prove what we have to prove based on the

5    indictment and a pattern that is charged.

6          And so what we anticipate doing, as we do in other

7    RICO cases, is that we say the conduct of the specific

8    defendants is this, and we also intend to prove other

9    conduct -- other crimes.

10          THE COURT:  As part of the pattern of racketeering.

11          MS. MACE:  As part of the pattern.

12          And so we always detail that in a motion for the

13   Court to say, these are the other things that we need to prove

14   in order to prove the pattern, to show relatedness, to show

15   the threat of continuing activity.  And so we will detail

16   that, and the defense can argue that something's too

17   prejudicial, or it's cumulative.  And we are just not at that

18   point yet.  But I can tell you, Your Honor, we are not going

19   to prove up every single scheme because we won't need to.  And

20   it may be if there's fewer defendants by the time we get

21   there, it would be even less.  We won't do more than what is

22   necessary for lots of reasons, one, efficiency, one, as

23   Your Honor pointed out, we don't want to have the evidence

24   sort of dwarf who is there, we will focus on who's there.  But

25   we have to prove the pattern and we'll do that.  And it's been

1    charged this way, and we are entitled to prove the pattern.

2          So I would propose the specific 403 issues should be

3    decided by the Court, but that would be the basis of a

4    separate motion.  The question here is whether the way it is

5    charged requires severance, and I think that's a separate

6    issue.

7          THE COURT:  Let me ask you one question.  Is it

8    conceivable that you would proceed to trial and you would set

9    this forth in the documents you are mentioning, that you would

10   only prove the four schemes that are alleged against these

11   particular defendants; is that conceivable?

12         MS. MACE:  I don't think so, Your Honor, because one

13   of the things that we need to prove is the relationship and

14   the relatedness over the pattern, which also goes to proving

15   the enterprise -- corruption of the enterprise itself.  And

16   there are certain types of schemes that will be the basis

17   of -- individual witnesses will describe multiple schemes that

18   show that this is a pattern of continued activity across the

19   region, both North America and South America.  So it is not

20   that you have a one-off instance of bribery in World Cup

21   qualifying matches, but something that happens over and over

22   again.  And that's why this is such a big problem.  It's not

23   that there's one guy who took a bribe here and it's totally

24   unrelated to that.  We have to prove that they're related and

25   show we are going to do that through the evidence and the

62

1   pattern.

2           THE COURT:  Okay.  Go ahead.

3           MS. MACE:  So I think as I noted, there's a separate

4   issue of when severance is required, which is a little

5   different than the evidentiary issue.  And there are some

6   cases in the RICO context in which severance is granted.

7   Those are generally two contexts.  One, sometimes the court

8   will grant it when a case is a mega trial.  It is so huge that

9   it just can't be managed.  And so you have a couple cases

10  cited by the defendants, *Gallo* and *Andrews*, and *Casamento*,

11  where you have 20, 30 more defendants and trials that lasted

12  more than a year.  That's not the situation that we have here.

13          Everyone cites the statistics, they say how many

14  paragraphs, how many pages, how many defendants.  What we have

15  is a five-defendant trial.  That's not that much.

16          THE COURT:  But that's what they're saying.  So,

17  therefore, how many schemes will you introduce against them?

18  That's their concern.

19          MS. MACE:  Which is the evidentiary question.

20          THE COURT:  Correct.  Okay.

21          MS. MACE:  So if we had all 40-plus defendants,

22  people and entities that have been charged in this case, all

23  here, I think we would agree with you, we can't have a trial

24  where you have 40 cross-examinations on every witness.  It is

25  just too unwieldy.  And so there's some cases like that.  And,

63

1    interestingly, when they have granted severance, they break it

2    into trials that look a lot like this one.  You have -- which

3    one was it.

4         I think it was *Andrews*, the El Rukns case in

5    Chicago, you had 20-plus defendants, and it is broken into

6    trials of five or four defendants.  Exactly the sort of size

7    we have here.  And we're not talking about a year or two-year

8    long trial.  Much shorter than that.  Something that's

9    manageable.  So I think this case does not fit in those sets

10   of cases that the defendants have cited.

11        The other type of case where you sometimes have

12   severance is, as Your Honor pointed out, where there's certain

13   types of crimes that are so heinous that they then reflect on

14   the defendants who are involved in a different type of

15   context.  So the *Asaro* case is one of those.  You had a

16   40-year racketeering conspiracy, really awful murders.  And as

17   evidenced in a recent trial in this courthouse, you had

18   evidence of moving a body, you have all sorts of very

19   troubling crimes, and then you had a couple defendants with

20   extortions in a discrete period of time.  Severance was

21   warranted, Judge Ross found there.

22        In other cases cited by the defendants, the same

23   sort of divisions have been made.  You have sometimes the

24   defendants alleged to have participated in murders or tried

25   separately from extortions, or gambling, separated off.  You

1   have those sorts of situations.

2           Here, we pointed out, that all the defendants are

3   alleged to have participated in the same type of conduct.  We

4   have a lot of reaction in the reply brief to that, saying it

5   is the same type of conduct, but it is all different.  Yes,

6   but that's what RICO is.  You have different instances of

7   crime, and the point that we are making is just that this is

8   not a situation where one type of crime overshadows another.

9   And on the point that some defendants seem to think that there

10  will be more evidence against one or the other, there's no

11  cases that say that.  There's no cases that say just because

12  one defendant, there's more evidence against him, he should be

13  severed from the others.

14          And I think the reality is that's not going to be

15  the case, in any event.  We'll have multiple witnesses who

16  speak to many of the different defendants, many different

17  schemes, there will be lots of overlap in the documents and in

18  the witness testimony.

19          So I think to just go back to Your Honor's question

20  about the consequence of how we've charged this, as I said,

21  the consequence is that we have a heavy burden.  We have to

22  prove that relatedness and the threat of continuity into the

23  future.  And that's something that is very real here.  This is

24  why this case was charged in this way, because as one of

25  defense counsel said, this was a way of life.  This was a

65

1    problem that was so pervasive that it was a pattern that was

2    across continents, across different soccer federations.  It

3    requires a different type of charge than having one-off little

4    charges as to individual crimes.  And that's why it is charged

5    that way.

6              THE COURT:  Well, the other consequence, I assume,

7    is that I might be more restrictive when we get to the point

8    of analyzing what evidence you are going to put in about the

9    RICO conspiracy.  That could be the other, quote-unquote,

10   consequence, as I have labeled it.

11             MS. MACE:  Potentially.  But, Your Honor, I think

12   the important thing at that time will be to apply Rule 403.

13   And so, here, I don't think any evidence will be of that sort

14   of heinous types that makes it so difficult for a jury to hear

15   as to one defendant and not think of as to another, if the

16   issue is cumulative, I think we will probably be --

17             THE COURT:  Or irrelevant, rather.  It doesn't

18   relate to these defendants.  That's going be the argument you

19   are going to hear.

20             MS. MACE:  Yes.  And some defendants will argue that

21   it is irrelevant.  And if we believe it is relevant because it

22   is necessary to prove a pattern, then we will lay out why that

23   is and how it ends up -- how it helps to demonstrate that

24   pattern.  That's our burden of proof, to prove beyond a

25   reasonable doubt that it is one pattern.  And so we will seek

66

1    to introduce that evidence.  But we are not going to try to

2    introduce cumulative evidence, because that hurts us as well.

3    We don't want to have the important stuff buried by other

4    stuff that has nothing to do with the trial defendants.  We're

5    only going to do that when we need to to prove that element

6    and burden that we have.

7           So I think that is the gist of our argument on

8    severance.  I have just a few things to say on speedy trial

9    unless Your Honor has any questions.

10          THE COURT:  No.  Go right ahead.

11          MS. MACE:  I think we'll rest on the law that we set

12   forth in our brief, but there's just a couple factual points

13   that I wanted to correct for the record, having listened to

14   Mr. Pappalardo on this.

15          One, Your Honor noted that Defendant Napout has

16   filed four motions, and Mr. Pappalardo pointed out that it was

17   on October 31 that he filed his motion for severance.  I think

18   one -- it's a little point, but something that has some

19   significance is that a couple days later, on November 2, he

20   asked for a request for an extension to file his motions to

21   dismiss.  So he got in his severance motion early, able to

22   make the rhetorical point, I would argue, that he has moved

23   for severance then.  And the schedule set by the Court was

24   then adjourned two weeks so that he could file his motions to

25   dismiss.  A small point, but just demonstrates that he wanted

1    to be able to file the motion to dismiss.  We didn't oppose

2    the extension.  We are all just participating in the same

3    schedule.

4           With regard to privilege, I would just note, I

5    disagree with a lot of what Mr. Pappalardo said about the

6    record, but it can speak for itself.  I'll just note, though,

7    that this was not only an issue about the common interest

8    privilege, that going back to -- I have a letter from July of

9    2016, where defense counsel sends the government a list of

10   lawyers representing Mr. Napout, and several of the lawyers on

11   there never represented Mr. Napout.  And it took us a long

12   time to unpack that and figure out what was going on, who

13   these lawyers were.  Many of them -- one was the general

14   counsel for CONMEBOL.  So it took the government some time to

15   figure out how to do the privilege review.  And that

16   contributed to the delay.

17          THE COURT:  One question I have.  When were the

18   documents that were the subject of the discovery dispute

19   seized by the government?  At the time of Mr. Napout's arrest,

20   or later?

21          MS. MACE:  With regard to the privilege dispute, it

22   began, I guess, with the seizure from CONMEBOL, which was

23   early January, I believe, January 7.

24          THE COURT:  Okay.

25          MS. PIÑERA-VAZQUEZ:  2016.

1          MS. MACE:  Yes.  2016.  And so promptly after that,

2    we began speaking with counsel for CONMEBOL, as well as

3    counsel for Napout, to try to figure out what lawyers

4    represented whom so that we could do this privilege review.

5    That process has taken a long time.  There were several things

6    that were not accurately presented to us, and that's why we

7    had to ask Judge Levy to resolve the issue.  And he found that

8    there was a difference in the representation of who

9    represented whom, that would have been told to the government

10   as well as the issue of the common interest privilege.

11         THE COURT:  Right.  As I guess as importantly, the

12   time that the government seized those CONMEBOL documents, the

13   defendant had already been charged and then was aware of the

14   seizure, hence prompting this procedure where he was allowed

15   to indicate who -- which lawyers may have represented him for

16   purposes of asserting a privilege as to some of these CONMEBOL

17   documents.

18         MS. MACE:  Yes.  And we reached out to him.  We have

19   a long series of letters that are now all in the record from

20   the hearing before Judge Levy, where we asked everyone who

21   might have in interest, including the law firms, everyone, to

22   tell us who represented whom.  We couldn't figure it out.

23   Because we had these conflicting documents from different

24   entities saying so-and-so represented this person, so-and-so

25   represented this person, and we just couldn't get to the

1    bottom of it.  And that's -- we filed many letters, they are

2    on ECF, to the Court, asking for help.  Because it just didn't

3    line up.  It didn't match.  And the concern, as we articulated

4    to Judge Levy, was that there was an effort on the part of an

5    alleged perpetrator to prevent a victim from sharing

6    information from the government.  And that was sort of

7    underlying the issue with the CONMEBOL search.

8         The government through the government of Paraguay

9    did a search on CONMEBOL, but then, also, the entity CONMEBOL

10   was trying to cooperate with the government and wanted to give

11   us stuff and --

12        THE COURT:  Mr. Napout --

13        MS. MACE:  -- Defendant Napout was saying that the

14   victim could not give that stuff to the government.

15        THE COURT:  Right.  CONMEBOL, as victim, could not

16   give that information to the government.

17        MS. MACE:  Correct.

18        THE COURT:  Yes, I understand all that.

19        So, in essence, though, that process relating simply

20   to the CONMEBOL documents started in January 2016, and only

21   after a fair amount of briefing, discussions between the

22   parties, namely Napout's attorneys and the government, and a

23   hearing that Judge Levy thought was necessary to sort out the

24   claim of common interest privilege, that process basically

25   went from January 2016 to March of this year.

1      MS. MACE:  That's right, Your Honor, and I guess --

2  on a happy note, I can tell you just an update on that, that

3  we hopefully have reached the end of that saga or near the

4  end.  We have been speaking with counsel for Napout and

5  counsel for CONMEBOL, and come up with an agreed approach to

6  how to do that privilege review, and we have already begun

7  running the numbers to see what would be involved, how many

8  hits on lawyer's names and so forth.  And it looks like it is

9  going to be a manageable size of documents.  So --

10      THE COURT:  Let me ask you a question, though.  Had

11  Mr. Napout's attorneys not asserted some kind of privilege as

12  to the CONMEBOL documents, you would have disclosed them to

13  the parties back in January 2016 or thereabout?

14      MS. MACE:  Shortly thereafter.  There was a gap of

15  time between the actual seizure in Paraguay and when they

16  showed up on our doorstep.  There was --

17      THE COURT:  In transit.

18      MS. MACE:  In transit.  And that was not immediate.

19  I don't remember the date right now when we actually received

20  them, but it would have been early spring that we received

21  them.  And then we could have processed those right away.  As

22  I said, CONMEBOL was cooperative and willing to participate in

23  that privilege review immediately, so that we could get those

24  things out the door.  And as I said, it looks like it is a

25  very small number of documents at issue that need to be

1    reviewed.

2         And so the rest, that 350,000 or so documents, most

3    of those we're preparing right now to send over to the

4    defense.

5         THE COURT:  They haven't received them yet.

6         MS. MACE:  They haven't received them because it is

7    just now that we got the ruling from Judge Levy, and that we

8    reached an agreement with defense counsel as to how to conduct

9    that privilege review.

10        THE COURT:  Okay.  Great.  Anything else on speedy

11   trial?

12        MS. MACE:  No, I don't think so, Your Honor.

13        THE COURT:  All right.

14        MR. PAPPALARDO:  Your Honor, may I?

15        THE COURT:  Yes.  I assumed you would.

16        MR. PAPPALARDO:  Just one point, Your Honor.

17        It is one thing -- we oppose the scheduling order.

18   We objected to the scheduling order.

19        THE COURT:  Let me back up.  The reason I asked the

20   government those questions about the CONMEBOL documents is

21   that you cannot tell me that the time delay, if you will,

22   between January 2016 and March 10, 2017, at a minimum, was due

23   to the fact that you wanted to assert a privilege as to the

24   CONMEBOL documents.  Now, you may take issue with how long

25   that process took, but my understanding from the government,

72

1   and I take the representation at face value, was that in the
2   beginning it was an iterative process between defense counsel
3   and the government, that the government claims that in some
4   way they were misinformed as to some of the attorneys who may
5   have represented Mr. Napout before, and that that had to be
6   sorted out as a rather complicated situation, factually as
7   well as legally, before Judge Levy or with Judge Levy's
8   intercession, and Judge Levy believed it required a hearing.
9   And based on what I have read of the decision and the hearing,
10  I agree that that was the sensible course, for your client, to
11  give him the fullest benefit of any argument you wanted to
12  make about a claim of suppression of these documents.

13          And so I just don't understand how you can argue
14  that that time shouldn't have stopped on that clock.  Period.

15          MR. PAPPALARDO:  I will let Ms. Piñera-Vazquez
16  address that because she was involved.

17          One thing I wish to point out for the record, Your
18  Honor, is that there was a moving target.  There was an answer
19  to a question, which then the question changed.
20  Ms. Piñera-Vazquez sent a letter in.  She was answering a
21  different question than the subsequent question that was
22  raised.  There was some --

23          THE COURT:  Misunderstanding.

24          MR. PAPPALARDO:  -- confusion.  We have no -- and
25  the other thing, Your Honor, that makes this kind of silly is

1    that the government has been in possession of probably, I

2    don't know this, but probably 95 percent of the materials that

3    they seized from CONMEBOL in a search on January 1.  They were

4    already in possession of that information because they

5    received it from McDermott, who represented CONMEBOL in the

6    late fall of 2015.

7            But the whole point, Your Honor, we don't care about

8    those documents.  The bottom line is this --

9            THE COURT:  But you must have.  You moved to prevent

10   the government from turning them over to everyone.

11           MR. PAPPALARDO:  We simply pointed out that there

12   was -- we believe that there was a common interest privilege

13   with regard to commercial transactions.  And then CONMEBOL

14   didn't waive commercial transactions.  So that was the end of

15   the discussion as far as we were concerned.

16           THE COURT:  I don't think that's accurate.  I think

17   that there's an agreement that there is a common interest as

18   to commercial transactions, but that doesn't get to the

19   document or the issue here.

20           MR. PAPPALARDO:  That was the only common interest

21   privilege that we asserted, Your Honor.

22           THE COURT:  I don't think that's accurate.

23           MR. PAPPALARDO:  It is, Your Honor.  That's 100

24   percent accurate.

25           THE COURT:  Well, maybe it's the scope, then, of how

74

1    you interpret commercial interest.  Because what ended up

2    happening is we had a fierce battle with the government over

3    whether or not your client could tell CONMEBOL they couldn't

4    release certain documents that may relate to his possible

5    complicity in a scheme to -- a bribery scheme that hurt, so

6    goes the argument, CONMEBOL's interest.  And that's where I

7    think the fight was.  Maybe that's an interpretation --

8            MR. PAPPALARDO:  No, Your Honor.

9            THE COURT:  -- of what it means to have a common

10   interest over commercial transactions, but I believe it was

11   outside of that commercial transaction common interest that

12   the fight was.  Am I misinterpreting that?

13           MR. PAPPALARDO:  If I may, Your Honor, we don't --

14   our interests are not -- we don't -- we are not here to assert

15   CONMEBOL's interest.  We didn't do that before.  We only

16   raised the common interest privilege as it related to

17   commercial transactions, which we defined as interactions when

18   Napout was president of CONMEBOL to get contracts that were

19   already outstanding, paid, and things of that nature.  Once

20   that was not subject to the waiver anymore, after the broad

21   waiver was carved out to exclude commercial transactions, that

22   ended it as far as my interests were concerned.  The only --

23   the only problem that surfaced is that Mr. Burt was determined

24   to be representing CONMEBOL and Mr. Napout at the same time.

25   That's why we are not sorting out, you know, does the

1    privilege -- is this communication subject to a Napout

2    privilege or is it a CONMEBOL privilege.  And that's what

3    we're sorting out now.

4             THE COURT:  Okay.

5             MS. MACE:  Your Honor, I don't think we need to

6    re-argue that whole issue.  I do want to make one

7    clarification because this is significant, I think, in the

8    context of the speedy trial argument.  As I said, as

9    Mr. Pappalardo just said, now that the government was a moving

10   target somehow.  And what we did is we asked for a list of

11   defense counsel.  And what we got back on July 7 is a letter

12   that said among others, Alfredo Montanaro represented

13   Mr. Napout.

14            There's no moving target here.  It's not about what

15   you're searching or what the issue is.  They said that the

16   general counsel of CONMEBOL represented Napout.  And now, I

17   happen to know from the list of searches, that there are

18   several documents, hundreds of documents, that -- with

19   Mr. Alfredo Montanaro's name on it in the CONMEBOL documents,

20   and so when they say we could have turned them over before, we

21   couldn't do that proper privilege review without an accurate

22   list of who the lawyers were.

23            So we had to get to the bottom of it.  We've done

24   that now, we are now moving quickly to be able to turn that

25   stuff over.  But it is just not accurate to say that we could

76

1    have done it before when we didn't have accurate information.

2              MS. PIÑERA-VAZQUEZ:  Your Honor, may I?

3              THE COURT:  Yes.  Speedy trial.

4              MS. PIÑERA-VAZQUEZ:  Just as to speedy trial, to get

5    back on track, Your Honor.  There's a couple of inaccuracies

6    that I would like to correct that Ms. Mace said before we

7    go --

8              THE COURT:  Wait, wait.  Slow.

9              MS. PIÑERA-VAZQUEZ:  Silvia Piñera on behalf of Juan

10   Napout.

11             Your Honor, first of all, I would like to clarify

12   for the record, when Mr. Napout was arrested on December 3 in

13   Zurich, I was in Miami, and I immediately contacted Ms. Mace

14   and alerted her that the electronic devices that they seized

15   off my client potentially contained attorney-client privilege

16   information.  So that was the first time that we communicated

17   that to the government.

18             A month later was the raid in CONMEBOL, where they

19   seized all these documents, January 1, 2016.  By that time,

20   our client was already here in the United States, had asserted

21   his -- and requested a speedy trial, having waived extradition

22   from Switzerland.  And, in fact, we even objected to the

23   complex designation, even though I understand the Court's

24   definition of the discovery and the indictment.  And, in fact,

25   since that day, we have continually objected to any further

1    delay and requested a speedy trial.

2            Now, the government waited until July 26, seven

3    months later, to deal with this alleged privilege issue.  In

4    other words, they didn't call me or call Mr. Pappalardo and

5    say, "Hey, we understand that there are these documents, let's

6    begin the process.  Are we going to do a taint team, are we

7    going to do a Chinese wall with privilege?"  You know, there's

8    20 million names for it now.

9            No.  They waited seven months.  They decided the

10   time frame, despite the fact that Mr. Napout had from

11   December 3 asserted an attorney-client privilege on all these

12   documents, which would extend to a certain extent to the

13   CONMEBOL documents.  They decided.

14           Now, there's an allegation that Ms. Mace made that

15   there was some sort of -- the inference is that we -- we,

16   meaning Mr. Napout's lawyers, tried to sort of extend or

17   broaden the amount of lawyers that represented Mr. Napout to

18   trick the government.  That's not the case, Your Honor.  We

19   were asked a very broad question, and we responded, as we

20   should, as all the lawyers that we knew to have represented

21   Mr. Napout.  That is now withered down, based on the narrowing

22   of the issues.

23           THE COURT:  But let me ask you, though.  I am not

24   assuming any kind of trickery involved, but the simple fact

25   that you named a number of lawyers, doesn't that support the

1     government's argument and address your own argument that it

2     took some time for the government to try to sort that out on

3     their own before coming to you in July of 2016 to figure this

4     out?

5              MS. PIÑERA-VAZQUEZ:  Well, they waited seven months

6     to address an issue that we had been requesting for seven

7     months be addressed.  We can't force them.  We can't force

8     them, "You have to do this."  I mean, we actually even met

9     with them at one point and said, "Can we go forward with

10    this?"  We basically begged, "Let's get this over with.  My

11    client wants a speedy trial.  He wants to resolve this.  He

12    wants to go back to Asunción and live his life."  I mean, he's

13    been here for two years almost, Your Honor.  And it dragged on

14    further.  There's nothing else we could do.  I mean, we did

15    the most we could to preserve our client's right to a speedy

16    trial.

17             Now, I agree with Ms. Mace, it's been sort of sorted

18    out, and we are proceeding now with a taint team.  So I don't

19    want to deal with the privilege issue any more because I think

20    that's -- I just wanted to stress the point as far as speedy

21    trial is concerned.

22             The other factual disagreement I have with Ms. Mace

23    is that she made a statement where apparently -- or gave the

24    inference, and I think I heard it right, that somehow either

25    Mr. Napout or his attorneys tried to convince a witness to not

1    turn over certain documents.  That is not true.  I believe

2    that she mentioned Alfredo Montanaro.

3            THE COURT:  Well, that's the argument.  The argument

4    is you were saying that because of the common interest

5    privilege, this is the legal argument, Mr. Napout would have

6    say in whether or not the documents that CONMEBOL might have

7    wanted to turn over to the government could be turned over or

8    not.  In other words, he could assert a common interest

9    privilege and say, no, those won't be turned over.  That's

10   what you wanted, right?

11           MS. PIÑERA-VAZQUEZ:  The problem is, that call was

12   never made.  That influence was never exerted on any witness

13   by Mr. Napout or his lawyers.

14           THE COURT:  So that's a legal argument you were

15   making.  That was the whole point of the motion, right, is to

16   assert that common interest privilege so that Mr. Napout could

17   have a say about whether CONMEBOL documents were turned over

18   to the government.

19           MS. PIÑERA-VAZQUEZ:  Well, two things.  First of

20   all, it's CONMEBOL's privilege.  But, more importantly, the

21   inference given was that Mr. Napout was trying to exert

22   illegal influence over a witness that had to turn over

23   documents that supposedly may harm him down the road, which

24   simply did not happen.  I don't want that to be left on the

25   record because that could be the basis of what they will claim

1    down the road is either obstruction of justice or tampering

2    with witnesses.  I want to be very clear, for the record, that

3    at no point has anybody tried to exert any witness at CONMEBOL

4    because that was a statement that was made.

5           THE COURT:  Let me pause here for a moment.  Whether

6    that comes in or not, I am not deciding that today.  If the

7    government has evidence of some effort to obstruct justice,

8    you will both make your arguments about whether it is

9    legitimate evidence or not.  But it doesn't affect the speedy

10   trial issue, one way or the other.

11          MS. PIÑERA-VAZQUEZ:  So, basically, Your Honor, the

12   bottom line with the speedy trial is that our client has done

13   everything he can to exert that right.  We had no control over

14   the government's schedule, and I understand the Court set the

15   schedule for the briefing.  And we did object to the briefing.

16   That's why we filed our speedy trial motion on October --

17   early, before the Court required, and then they responded when

18   they had to.  But there's nothing else that we could have done

19   to --

20          THE COURT:  But what's the prejudice?

21          MS. PIÑERA-VAZQUEZ:  Two years in the United States,

22   living under 24/7 security, not being able to work.

23   Your Honor, these are legitimate concerns.  He's here alone in

24   this country.  Yes, his family can come and go, but he has a

25   business that he's supposed to be running that he can't run.

1    He doesn't have unlimited resources like the government that

2    can spend four years investigating a case, two years waiting

3    for it to go to trial.  I mean, when I was a prosecutor in the

4    Southern District of Florida, we were taught very clearly:

5    You do your investigation.  The day you indict the case, you

6    get ready to try it within the speedy trial, and you turn over

7    all the discovery.  And if you don't -- and it doesn't matter

8    how complex it was, you were ready to go to trial.

9            Certainly, that's not the case here, Your Honor.

10   What happened?  I mean, it is two years down the road.  The

11   prejudice -- he's sitting here, not being able to live his

12   life.  And he's in custody.  And he's -- there's no money.  It

13   is running out.

14           And then the other thing, Judge, is discovery.  I

15   mean, which is another issue, which I can talk about it now,

16   but when is it going to be cut off?  I mean, motions are due

17   in a month.  I just got a dump of discovery on Monday of

18   information that they had years ago.  I mean, I don't

19   understand.  Is there going to be a cutoff date?  Are we going

20   to keep getting this rolling discovery or --

21           THE COURT:  I think whatever evidence the government

22   has that might be introduced at trial, they should turn over

23   as soon as they get it.  I don't think the complaint should be

24   that they are giving you too much information.  If you get it

25   too late in relation to the trial, or in relation to being

1   able to make a motion to suppress or something else, that's a

2   legitimate argument.  But then continuing to follow their

3   obligation to turn over discovery as they get it, I am not

4   going to fault them for that.  Now --

5           MS. PIÑERA-VAZQUEZ:  We want all the *Brady*.  We want

6   all the *Brady*.  For sure we want all the *Brady*.  Yeah, we got

7   all the *Brady*, but we keep getting information that affects

8   the speedy trial.  We can't effectively be prepared -- I mean,

9   the bottom line is, there has to be a cutoff date so we know

10  what we're able to investigate.  We have to do our

11  investigation.  We have actually affirmative defenses that we

12  are going to put on.  So we have to do our investigation on

13  the discovery that they give us.  How on earth can we do that

14  if the --

15          THE COURT:  It's not going to affect speedy trial.

16  I mean, bear in mind, we have a trial date, which I thought

17  was the most curious part of your brief.  You kept suggesting

18  that somehow there isn't going to be a trial on a date

19  certain.  We have a date certain to start trial.  That will

20  happen.  The government has even acknowledged that if new

21  defendants come in between now and trial, it is likely that

22  they will have to be severed.  I think we can all agree on

23  that.

24          In terms of evidence coming in, if you think there's

25  some unfairness brought by having received information late,

1   you should absolutely make that argument.  But I am not moving

2   the trial date.  We have a trial date.  So to the extent that

3   you're arguing speedy trial, what you are talking about is the

4   time from now, and, quite frankly, when I resolve the motion

5   on the motion to dismiss -- I'm sorry, the motion for

6   severance, until we get to trial, your only argument, in my

7   opinion, is that you were somehow required to brief certain

8   issues at the same time as other defendants.  There's just not

9   much percentage in that argument because we have a case that

10  involves multiple defendants.  It would make no sense for me

11  to actually give everybody a separate deadline and require the

12  government to respond multiple times, especially when the

13  argument, as here, is really one sort of type of argument,

14  namely, prejudicial spillover, et cetera, et cetera.

15          But I hear what your argument is.  I just have to

16  tell you, I don't accept it.  And, also, I think there's so

17  many, as I mentioned before, different statutory ways in which

18  it was entirely proper to stop the running of the speedy trial

19  clock to exclude the time for some reasonable period to allow

20  other defendants to be brought in.  Mr. Burga, I guess, would

21  be an example of someone who entered in at some point.

22          But, more importantly, to give your client ample

23  opportunity, which he has used quite readily to make all of

24  the arguments that you think are appropriate in his defense.

25  Everything from motions -- a motion to dismiss to the

1    discovery motion over the privilege, to the severance motion

2    and beyond.  We have some more motions to get through before

3    we get to trial.  And unless you want me to not allow you to

4    do that, there's really no argument to be made that this is

5    moving too slowly or in a way that prejudices your client in

6    some respect that the case law recognizes, as opposed to the

7    inconvenience it's brought on his life.

8                I am not minimizing that.  I am sure it is quite

9    expensive for him to maintain a luxury apartment in Miami with

10   his whole family there.

11               MS. PIÑERA-VAZQUEZ:  Actually, Judge, it is not

12   inconvenience.  It is actually extremely prejudicial, and to

13   sort of make it seem as if he's living in a luxury apartment

14   with all his family and is not prejudicial is really wrong

15   because he is in custody.  He in custody.  He is living in a

16   foreign country.  This is not his country.  And he can't even

17   work in his business.  So I think that it is prejudicial.  I

18   mean, I don't think -- I wouldn't want to live in Paraguay for

19   two years away from my family, no matter whether I was living

20   in a presidential palace.  I'd want to be at home with my

21   family going to my daughter's kindergarten graduation and my

22   son's first communion.  I mean, it is prejudicial, Your Honor.

23   And I think the bottom line here is -- and I will sit down

24   because I think I have said too much.

25               There's a reason for speedy trial.  There's no

85

1    question in this case the government was not ready to go to

2    trial when we asked for a speedy trial.  They were not ready

3    to go to trial because we are still getting discovery today.

4    Two years later.  If my client would have been granted what he

5    asked for, which was a speedy trial from the day he waived

6    extradition from Switzerland, he would be home today.  He

7    would have been home several years ago.

8            This is not --

9            THE COURT:  I cannot agree with anything you are

10   saying because of the process your client himself has availed

11   himself of.  How much quicker could we have resolved four

12   different motions from your client alone?  You would ask us to

13   fast track his entire trial ahead of everybody else, when you

14   have interceded with four different motions.  I mean, if

15   anyone wants to complain, I imagine it might be the other

16   defendants who are stuck with your client who wants to file

17   every single motion.

18           And to the extent that there is late discovery, some

19   of it is these CONMEBOL documents that your client has been

20   fighting over letting the government produce or use.

21           So your argument, really, you are just the wrong

22   purveyor of that argument.  If there's a speedy trial motion

23   to be made, I have to say, Mr. Napout is the last person for

24   whom I think it is valid, given how much process, rightfully,

25   as is his due right, has used, that has accounted for a huge

1    amount of the -- I am not even going to call it delay, but the

2    amount of time the case has consumed.

3            This is an enormous case that has a lot of

4    discovery, a lot of issues that have to be sorted out.  We've

5    tried to move it along as expeditiously as possible, while

6    giving every defendant as much opportunity as they want to

7    make whatever motions they think are appropriate.  But,

8    please.

9            MS. PIÑERA-VAZQUEZ:  No, I think --

10           THE COURT:  You can tell where I am coming from.

11           MS. PIÑERA-VAZQUEZ:  We want our November 7 --

12           MR. PAPPALARDO:  November 6.

13           MS. PIÑERA-VAZQUEZ:  -- hopefully we'll go to trial

14    that day, November 6, and there'll be no --

15           THE COURT:  Fear not.  Subject to some, God forbid,

16    nuclear attack, we are going forward on November 7.  So you

17    have your date certain for a trial.  The question is, will be,

18    after I decide this motion, how many of the five defendants

19    will go to trial or at least will be slated to go to trial.

20           MR. STILLMAN:  Your Honor, I have a less emotionally

21    charged comment.  And that is, Ms. Mace refers to a 403

22    motion.  Now, most of the time I have seen 403, it's during

23    trial, "Object, 403."

24           Now, do I understand the government's saying we are

25    going to tee up the 403 issue in advance of trial?

1              THE COURT:  Yes.

2              MS. MACE:  Yes, Your Honor.  And, typically, we

3    style it as an other acts motion.  Sometimes it's referred to

4    as a 404(b) motion.  In a racketeering context it's not

5    typically 404(b) evidence because it is evidence of the

6    racketeering enterprise.  And so it is typically our practice,

7    and we propose doing it in this case, to brief for the Court

8    what is outside of the conduct of the defendants who are going

9    to trial so that defense can object and say "We think that

10   should be excluded under 403" or any other basis.

11             THE COURT:  I think that's a very prudent

12   alternative avenue we should pursue here because there will

13   be, to be sure, some argument, I imagine, about the other bad

14   acts, I will call it, evidence, even though technically it is

15   not.

16             MR. STILLMAN:  Good to hear that, Your Honor.  I

17   just wonder if I can -- I know judges don't like cross

18   questioning or talking.

19             THE COURT:  Go ahead.

20             MR. STILLMAN:  When?

21             THE COURT:  Yes.  So that's a subject of discussion.

22   I actually get to decide when, or at least I have some --

23             MS. MACE:  Vision?  So we will leave it to

24   Your Honor.  I think a date that would make sense, sort of

25   looking to when the -- counting back from the trial date, we

1  thought that 90 days before trial, or August 7, would allow
2  time for briefing of that.  If there are any defendants who
3  are no longer in the case, that will sort of help this shake
4  out as well, and that will allow time for resolution of that
5  in enough time for trial that everyone can prepare
6  appropriately.

7           THE COURT:  Right.

8           What do you all think?  90 days?

9           MR. STILLMAN:  In as much as I think -- we have a
10  May date for the motions we have to make.  Why can't we put
11  all that together, and we will make our motions by May 8, and
12  let the government makes theirs, and get all these things teed
13  up, and get ourselves organized for a nice November 10 trial.

14           THE COURT:  What's our May 8 deadline?  Suppression,
15  or motions in limine, right?

16           MS. PIÑERA-VAZQUEZ:  Any motions to the fact, to the
17  discovery.

18           THE COURT:  Any motion to the discovery, or the
19  facts.  Any factual --

20           MS. PIÑERA-VAZQUEZ:  Motions to suppress, yeah.

21           THE COURT:  I view these as different and, quite
22  frankly -- I don't know.  I mean, I think the concern on the
23  government's part may be that it is a little early for you to
24  know exactly what you are going to put on for the other acts
25  evidence.

1          MS. MACE:  Yes, Your Honor.  And I think as trial

2     prep continues, one of the things that we do is we narrow that

3     evidence down to a smaller set of evidence, and, also, if

4     there are other resolutions, that can change the landscape

5     significantly.  And so I found when we do it too far in

6     advance, then you end up doing it twice.  And so that's part

7     of what motivates us, we want to leave enough time, and that's

8     why we're thinking August.  I think a little bit before that

9     would be fine as well, but I think May is a little too early.

10          THE COURT:  Well, I guess the question is, if we

11     want to combine the briefing, maybe what we might do is move

12     the suppressions motion until later, and still combine them

13     with the other acts, because I do think there's a certain

14     economy achieved by having one set of briefing.

15          So maybe we delay the motions to suppress by a month

16     and a half or so, and get us into July, and we have everything

17     done together in July.  Does that sound workable?

18          MS. MACE:  That would be fine with the government.

19          MR. STILLMAN:  It's okay with us, yes.

20          THE COURT:  Okay.  They do have some crossover

21     potentially.  But let's try that.

22          But then the government is going to have to produce

23     something in advance.  Well, no, I guess you'll produce it at

24     that time, and then the other side will respond.

25          MS. MACE:  See our motion.  So I think it --

```
 1            THE COURT:  Sort of cross.
 2            MS. MACE:  -- perhaps it will work well, the
 3    briefing schedule would be defense motions to suppress, on the
 4    same day that we file our motion for --
 5            THE COURT:  Other acts.
 6            MS. MACE:  -- to admit other acts, and then we'll
 7    have cross reply times, and we won't be each briefing them at
 8    the same time.
 9            THE COURT:  Perfect.
10            MR. STILLMAN:  And nobody likes the summer anyway.
11            (Laughter.)
12            THE COURT:  Yes, Mr. Paulson?
13            MR. PAULSON:  Judge, if I may --
14            MR. STILLMAN:  Sorry.  I also wanted to -- maybe
15    this is an appropriate time, Your Honor, to talk about the
16    Jencks and Giglio and things like that.
17            THE COURT:  You mean in terms of when the government
18    will turn it over?
19            MR. STILLMAN:  Yes, Your Honor.
20            THE COURT:  Well, let's wait and see.  One second.
21            Mr. Paulson, did you want to talk about this
22    briefing schedule we're proposing?
23            MR. PAULSON:  Not the schedule so much, Your Honor,
24    but how the concept of the 403 motion and the other acts plays
25    into our severance argument.
```

1          THE COURT:  Well, they will be separate.  I am first

2    going to decide the severance issue.  However, I cannot say

3    that the potential or the possibility of resolving some of

4    these claims of prejudice, by way of looking carefully at the

5    evidence that the government intends to produce on the RICO

6    conspiracy won't affect my decision.

7          Because, practically speaking, I am looking

8    forward -- ahead, rather, to what's the most efficient result.

9    And to the extent that we can address some of the prejudice

10   arguments that have been raised, there will be some

11   consideration of the possibility, but not necessarily the

12   resolution of those issues.  So, in other words, you won't

13   know how those will resolve, but the fact that we have this

14   mechanism I think will play into my decision to some extent.

15         MR. PAULSON:  My point, I guess, Your Honor, with

16   respect to Mr. Trujillo in particular, there may be other acts

17   that the government wants to introduce that are not part of

18   these five schemes that are relevant to these defendants, but

19   that might be relevant to the overall RICO conspiracy, to

20   which we would not have -- to which we would not have

21   objections insofar as they are introduced to prove the RICO

22   conspiracy with respect to Mr. Trujillo.  However, most of our

23   prejudice arguments with respect to severance have nothing to

24   do with the other acts, they have to do with --

25         THE COURT:  These defendants.

1          MR. PAULSON:  -- the CONMEBOL, Copa do Brasil, Copa

2    Libertadores schemes, and how they relate to Mr. Trujillo.

3          THE COURT:  I will specifically address your

4    client's arguments in that context.  Because as I said, there

5    are sort of two aspects of the arguments that both sides --

6    that all defendants have made, the bigger RICO conspiracy

7    evidence argument, and then the more specific argument

8    vis-à-vis the other defendants who are going to trial.  So I

9    will address that.

10          MR. PAULSON:  Thank you.

11          THE COURT:  The other thing I'll mention, although

12   I'm a little afraid to do this, is that it is possible that

13   when we get to this point of deciding what evidence might come

14   in or not come in, based on a 403 analysis, that it might

15   resuscitate an argument for severance, I can almost tell you

16   probably not as to the CONMEBOL defendants, but possibly as to

17   Mr. Takkas and Mr. Trujillo.  Possibly.  And so let's say you

18   survive this round.  I will say that if at that time you think

19   it is worth reviving that argument, you can make your argument

20   at that time.  In other words, if I say, yes, the government

21   gets to put in all of the evidence they want to establish

22   either RICO conspiracy or obviously the evidence relating to

23   the other defendants, I would permit you to try to re-argue

24   your severance if you wanted to at this point, at least with

25   respect to the two nonCONMEBOL defendants.

93

1           MR. PAULSON:  Thank you, Your Honor.

2           THE COURT:  So we'll see.  I shouldn't actually

3   limit it to those two, but I won't necessarily reject it out

4   of hand.  Because I realize that some part of the calculus may

5   have to do with how I make that determination about 403.  This

6   is called a 403 analysis, okay, when we specifically find out

7   what the evidence is.

8           MS. MACE:  Your Honor, just on that point, I think

9   there's -- I don't know if this is important to make now, but

10   on the 403 analysis, of course, it is defendant by defendant.

11          THE COURT:  Yes.

12          MS. MACE:  And so we will be arguing in our motion

13   what evidence can be admissible as to each defendant, and they

14   should be considered individually.  And so if the Court were

15   to rule that the evidence is admissible and not unduly

16   prejudicial as to Defendant Trujillo, then I don't think that

17   would revive a motion for severance because that would be a

18   ruling that the evidence could come in even in a trial of just

19   Mr. Trujillo.

20          THE COURT:  Right.  You would say it would defeat

21   it, in effect.

22          MS. MACE:  Yes.  And if the Court were to find that

23   it is unduly prejudicial, there could be two results.  I

24   suppose one would be that it would be excluded altogether, or

25   excluded as to one defendant with a limiting instruction.  But

1   if the Court were to rule that it is admissible, I don't think

2   that that would then trigger a new severance motion.

3          THE COURT:  It would be inconsistent.  I understand

4   what you're saying.  And I think that's a fair point.  You

5   know, let's table that for now.  Let's see what happens when

6   we get to the actual point of seeing this 403 evidence and how

7   that all shakes out.

8          Ms. Mace is probably right, that in order to make

9   the assessment that it is admissible, it probably subsumes the

10  argument that an individual defendant could be severed on that

11  basis.  But I am just sort of thinking about -- thinking a

12  little bit how this is all going to work out.

13         So at this point I am not going to make a

14  determination either way.  It is something for the defense,

15  obviously, to think about, not that I need to give you any

16  ideas.  I am sure you would have thought of this on your own.

17  And the government would obviously respond that that would be

18  inappropriate, having made a finding that all of that

19  potential 403 evidence still comes in.

20         So let's -- the other question you asked,

21  Mr. Stillman, was about *Giglio* and *Jencks*, right?  So we have

22  a trial date of November 7.  I would think at least a month in

23  advance, four weeks in advance.  This is a pretty -- this is

24  going to be a lot of evidence, right?

25         MS. MACE:  There is.  And I think, generally

95

1   speaking, that is appropriate.  We would like to have an

2   opportunity to propose to the Court something a little bit

3   more detailed because there are some witnesses who are

4   particularly sensitive that will have to travel, and when they

5   are -- that we would not want to disclose certain things while

6   they are outside of the United States and so forth.

7           And so we would like to be specific with regard to

8   each witness.  There are certain witnesses we can provide well

9   in advance, and others that we will want to do closer in time

10  to their testimony.  So we would like to propose to the Court

11  something detailed --

12          THE COURT:  That's fine.  But in terms of the

13  information or witnesses as to whom there might not be any

14  special circumstances, how much time would you be willing to

15  turn that over or can you turn that over?

16          MS. MACE:  I mean, certainly, a month before jury

17  selection, we can commit to now, and maybe even earlier for

18  some witnesses.

19          THE COURT:  Right.  I am wondering, six weeks for

20  the nonspecial stuff, and then we can discuss the schedule for

21  the other.  Because --

22          MR. UDOLF:  Judge, may I interrupt?

23          THE COURT:  Yes.

24          MR. UDOLF:  Is that as to *Giglio* and *Jencks*?

25          THE COURT:  Yes.  I believe so, right?  Because the

96

1    concern, I think, is identifying who the person is.  The

2    witnesses as to whom there's some sensitivity.

3            MR. UDOLF:  Not the substance of what they say, just

4    the identity in general?

5            THE COURT:  No, the substance of what they say, I

6    guess.

7            MS. MACE:  Well, I mean, that's the issue, that

8    sometimes there is some very sensitive information that's

9    sensitive in and of itself and also some that makes it very

10   clear who the witness is or where they are and so forth.

11           And so we intend to get it to the defense in enough

12   time to prepare some of those sensitive witnesses.  We will

13   have very small amounts of material that goes with them.  But

14   as I said, we can propose something earlier to the Court

15   that's detailed, but we just don't want to commit now to early

16   disclosure of those sensitive witnesses.

17           THE COURT:  What I propose is that for anything as

18   to which there's no special circumstance, if you could provide

19   that to the defense six weeks in advance, then certainly they

20   can spend a considerable amount of time digesting all the

21   nonspecial information, which will, to my mind, blunt an

22   argument that they don't have enough time to consider the much

23   smaller group of Jencks and *Giglio* relating to the more

24   sensitive witnesses.  That would actually go a long way in

25   terms of my willingness to give you more time to -- more delay

1    in terms of turning it over for reasons that you will have to

2    provide justifying that.

3              So that's my proposal.  So six weeks before the

4    trial date.  Let me turn to my trusty deputy, who has to do

5    all these calculations.

6              And just so you know, we will recapitulate all these

7    deadlines in the docket order, in case you're not taking

8    copious notes.

9              THE COURTROOM DEPUTY:  September 25.

10             THE COURT:  September 25, for the government to turn

11   over *Jencks*, *Giglio*, relating to any witness as to whom they

12   are not making a special application.  And I will urge the

13   government to turn over redacted copies of whatever you can,

14   even as to those witnesses you are concerned about, if you can

15   do so in a way that you think is consistent with whatever

16   security or other issues you have.  Okay?

17             MS. MACE:  Understood, Your Honor.  Thank you.

18             THE COURT:  Okay.  And then you will at the same

19   time when you make that -- when you turn that over, submit

20   whatever application you want as to the other witnesses, but

21   do that ex parte, in camera, so that I can see those.  And,

22   obviously, file notice that you're submitting it ex parte and

23   in camera so the defense knows that has happened.  And I will

24   analyze those separately.

25             MS. MACE:  Understood.  Thank you.

98

1           THE COURT:  All right.  Does that satisfy your

2    question, Mr. Stillman?

3           MR. STILLMAN:  It does, Your Honor.  Thank you.

4           THE COURT:  All right.  Anything else from anyone

5    else about anything else?

6           MR. UDOLF:  Judge, I have one issue.  We have never

7    set a briefing schedule for Mr. Burga, and he just came into

8    court in December of this past year.  And, you know, we were

9    not able to get in on the deadline for the motion to dismiss.

10   And then, unfortunately, I was taken sick and was out of

11   commission for two months.  I have been in discussions with

12   counsel for the government, and they have no objection to

13   giving us three weeks, file anything that might be relevant to

14   a motion to dismiss, provided they have three weeks to

15   respond.

16          THE COURT:  That's fine.  Obviously, taking into

17   account what I have already written on the topic, based on the

18   motions filed by Mr. Marin and Mr. Napout, right?

19          MR. UDOLF:  Right.  To the extent it is duplicative,

20   we would incorporate their arguments.

21          THE COURT:  Just to preserve it.

22          MR. UDOLF:  Right.  Just to preserve the issue.  But

23   there are some issues that may be unique to Mr. Burga, so.

24          THE COURT:  Right.  I think you alluded to one.

25   That's fine.

1          Is the government in agreement, as Mr. Udolf says?

2          MS. MACE:  Yes.

3          MR. NITZE:  Yes.

4          THE COURT:  Okay.  So three weeks from now, which

5  is --

6          THE COURTROOM DEPUTY:  April 27.

7          THE COURT:  -- April 27, you will file something on

8  behalf of Mr. Burga.

9          And then three weeks after that --

10         THE COURTROOM DEPUTY:  May 18.

11         THE COURT:  -- the government will file its

12  response.

13         And then two weeks after that for reply.

14         THE COURTROOM DEPUTY:  June 1.

15         THE COURT:  All right.

16         MR. NITZE:  Just on speedy trial, Your Honor.  As

17  you noted, there are a number of bases on which the clock has

18  stopped, but we would ask that Your Honor continue the

19  designation of the case as complex, in our view, it is not a

20  close call, and exclude, in addition to the other bases, in

21  the interest of justice, on that ground.

22         THE COURT:  Yes.  I absolutely will.

23         I certainly have found more than once that this is a

24  complex case.  And, certainly, that finding I think is

25  supported by the defendants' own submissions relating to the

1    scope of this case and the amount of evidence that has to be

2    digested and reviewed.

3              In addition, we still have pending motions.

4    Obviously, Mr. Burga has entered, and he's got a motion to

5    dismiss that will be pending, and then we will have more

6    motion practice relating to the 403.  So for under a number of

7    reasons under 3161(h), I am going to toll the time until we

8    get to trial, because I know we will have motions all the way

9    up to trial.

10             All right.  Obviously, you've preserved your speedy

11   trial motion.

12             MR. PAPPALARDO:  Yes, Your Honor.

13             THE COURT:  Thank you, everyone.  Good seeing you

14   all again.

15             (WHEREUPON, at 12:25 p.m., the proceedings were

16   concluded.)

17

18                          *  *  *  *  *

19                    **REPORTER'S CERTIFICATE**

20

21        I, ANNETTE M. MONTALVO, do hereby certify that the
     above and foregoing constitutes a true and accurate transcript
     of my stenographic notes and is a full, true and complete
22   transcript of the proceedings to the best of my ability.

23        Dated this 14th day of April, 2017.

24   /s/Annette M. Montalvo_____
     Annette M. Montalvo, CSR, RDR, CRR
25   Official Court Reporter