

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

PT:KTF
F. #2015R00707

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 27, 2017

By ECF and Hand

The Honorable Pamela K. Chen
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:    United States v. Costas Takkas
               Criminal Docket No. 15-252 (S-1) (PKC)

Dear Judge Chen:

       The defendant Costas Takkas is scheduled to be sentenced on October 31, 2017, following his guilty plea on May 24, 2017, to one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). The defendant's Presentence Investigation Report ("PSR"), as modified by the addendum to the PSR ("PSR Add."), calculates a total adjusted offense level of 21 and a criminal history category of I, with a corresponding Guidelines range of imprisonment of 37-46 months. PSR ¶¶ 48, 88. The government objects to this calculation as described below, further objects to the PSR's position on restitution, and respectfully submits this letter in aid of sentencing and in opposition to the defendant's sentencing brief, dated October 23, 2017 ("Br."),[1] in which he seeks a sentence of time served. For the reasons set forth below, the government respectfully submits that the Court should adopt the PSR and the addendum to the PSR except where noted regarding the calculation of the base offense level and with respect to restitution, impose a restitution order against the defendant in the amount of $3 million in favor of the Caribbean Football Union ("CFU"), and sentence the defendant to a term of imprisonment within the Guidelines range adopted by the Court.

---

[1] The brief itself lists a date of October 22, but it was filed on October 23.

The Honorable Pamela K. Chen
October 27, 2017
Page 2

I.      Background

        As is described in more detail in the PSR and the above-listed superseding indictment (the "Indictment"), the sport of soccer is governed worldwide by the Féderation Internationale de Football Association ("FIFA"), FIFA's constituent continental confederations (including CONCACAF, the confederation covering North America, Central America and the Caribbean), and FIFA's constituent national member associations (which are also known as federations).  Some confederations, such as CONCACAF, include regional football subgroups within them, including the Caribbean Football Union ("CFU"), which is composed of federations from the Caribbean region.  Since 2004, soccer officials, including officials of FIFA, CONCACAF, the CFU and national member associations, have been bound by FIFA's code of ethics, which, among other things, imposed a fiduciary duty on soccer officials in favor of the soccer organizations they represent and prohibited them from accepting bribes or kickbacks.

        The CFU member federations owned the media and marketing rights to soccer matches they played in their home territories during the qualifying stages for the men's World Cup tournament.  Rather than sell these rights separately, the CFU member federations agreed to bundle their rights together for sale.  The CFU, like many other soccer governing bodies, typically sold these rights to sports marketing companies that served as intermediaries, who in turn sold different portions of the rights to different broadcasters and media companies around the world.  A significant portion of the value of the overseas media rights to CFU federations' home World Cup qualifier matches was derived from the broadcast of those matches in the United States, including matches played against the United States national team.

II.     Offense Conduct

        As set forth in the Indictment and the PSR, the defendant was a longtime associate of Jeffrey Webb.  Webb, who had served for years as president of the Cayman Islands Football Association ("CIFA," which was a member of the CFU), also became a high-ranking official of the CFU after the expulsion in 2011 of Jack Warner, the previous CFU and CONCACAF president, and in 2012 Webb became the president of CONCACAF as well.  Around that time, an executive of Traffic USA, a sports marketing company based in Miami, began negotiations with Webb to purchase the bundled media and marketing rights to the CFU federations' home qualifier matches for the 2018 and 2022 World Cup cycles. The defendant communicated on Webb's behalf to the Traffic executive that Webb wanted a $3 million bribe in exchange for awarding these rights to Traffic.  The Traffic executive agreed, and a few months later, after Webb had appointed the Traffic executive to serve as general secretary of CONCACAF, Traffic and the CFU entered into a contract for the sale of these rights.  Meanwhile, the defendant began to work with the Traffic executive to determine how Traffic could pay Webb this bribe while disguising the true nature of the payments.

The Honorable Pamela K. Chen
October 27, 2017
Page 3

        The defendant held meetings with other Traffic executives both in Miami and in Brazil, where Traffic's parent company was located, to make arrangements for Traffic to secretly make these bribe payments to Webb.  Following these meetings, in November 2012, Traffic wired $1.2 million from a bank account in Florida to an intermediary's bank account in Hong Kong, from which $1 million of these funds were wired to an account in the Cayman Islands owned by Kosson Ventures, Limited, a company the defendant controlled. In December 2012, Traffic, through an intermediary, wired an additional $500,000 to the Caymanian bank account of CPL Limited, another company the defendant controlled.  In the course of receiving these funds, the defendant made false statements about them, and the accounts receiving them, to Caymanian bank employees who inquired about them.  The defendant also created bogus consulting contracts that purportedly justified the payments.

        After receiving these funds in the Caymanian accounts, the defendant conveyed them to Webb and the Traffic executive, or spent the funds for their benefit.  For example, after wiring some of the funds to a Citibank account he held in Florida in his own name, the defendant used funds in that account to pay for real estate in Georgia that Webb was purchasing, and for a swimming pool at Webb's house in Georgia.  During the course of the scheme, the defendant lied to a Citibank employee about the payment for the pool after the employee inquired about the payment, falsely saying that it was a wedding gift for Webb. The defendant used other of these funds to pay for luxury leather goods and watches for Webb and the Traffic executive, and a kitchen remodeling and expensive painting for the Traffic executive.

        Also in 2012, Traffic entered an agreement with another Miami-based sports marketing company named Media World, whereby the two companies pooled the media and marketing rights they had obtained for World Cup qualifier matches in the CONCACAF region, and shared responsibility for associated costs.  As part of that agreement, Media World agreed to be responsible for half of the $3 million bribe that Traffic had agreed to pay Webb for the CFU media rights.  The defendant met with a Media World executive in Miami on several occasions to discuss how Media World could pay this bribe in a hidden manner. Eventually, the defendant and Media World arranged for $500,000 to be sent from a Panamanian front company to various accounts in the United States, the Cayman Islands, and St. Vincent and the Grenadines, again using bogus consulting contracts to mask the true nature of the bribe payments.  The defendant spent some of these funds to benefit Webb before the scheme was disrupted, first by the conspirators' concerns about the government's investigation and then by the disclosure of the scheme in May 2015 when the initial indictment in this case was unsealed.

        During this period, the defendant often traveled with Webb to soccer matches, tournaments, meetings, and functions, sometimes at CONCACAF's expense and sometimes using the bribe funds.

The Honorable Pamela K. Chen
October 27, 2017
Page 4

III.    Sentencing

    A.    Legal Standard

       Sentencing courts have the authority to fashion a reasonable and appropriate sentence in each case.  In so doing, a sentencing court must consider the Guidelines in formulating such a sentence.  United States v. Booker, 543 U.S. 220, 259-62 (2005).  The "Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007).  Next, a sentencing judge should consider all of the factors in 18 U.S.C. § 3553(a) to determine the appropriate sentence in each case.  Id. at 49-50.  Those factors include, among other things, the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant; and to avoid unwarranted disparities between similarly situated defendants.

    B.    The Applicable Guidelines Range

       As indicated above, the Probation Department calculated a total offense level of 21, which corresponds to a Guidelines range of 37-46 months under Criminal History Category I.  PSR ¶¶ 48, 88.  The defendant has not contested this calculation, but for the reasons set forth below, the government submits that it erroneously assigns a base level of six rather than seven, so the total offense level and Guidelines range should be 22 and 41-51 months, respectively.[2]

       The PSR calculates the defendant's base offense level as six rather than seven because his money laundering offense of conviction references U.S.S.G. § 2S1.1 in Appendix A to the Guidelines, even though the SUA of wire fraud underlying his money laundering offense references U.S.S.G. § 2B1.1 and carries a maximum sentence of 20 years or higher.  See U.S.S.G. § 2B1.1(a), PSR Add. at 1.  While this position may appear to be dictated by the language of this Guidelines section and § 1B1.2(a), it leads to the anomalous result that a money laundering offense with an SUA of wire fraud is punished with only one additional offense level more than a conviction for wire fraud, when it is readily apparent from the Guidelines that the Sentencing Commission intended for such a conviction to be

---

[2] The defendant stipulated in his plea agreement to a calculation predicated on a base offense level of seven, but he characterizes the government's position to opposition the Probation Department's position as "regrettable" and suggests that in another type of case, the prosecution would have "let it go" rather than contest the issue.  Br. at 8-9.  The government construes these statements as something other than opposition to the government's position, as such opposition would constitute a breach of the agreement.

The Honorable Pamela K. Chen
October 27, 2017
Page 5

punished two offense levels more severely than a wire fraud conviction.  See U.S.S.G. §
2S1.1(b)(2)(B).

        The government submits that the language of § 2B1.1(a) referring to a
defendant "convicted of an offense that refers to this Guideline" encompasses, in the unique
context of a money laundering conviction, a defendant convicted of a money laundering
offense for which the SUA refers to § 2B1.1.  This position is consistent with multiple
courts' application of the Guidelines to money laundering offenses.  See United States v.
Mirzoyan, No. 10 CR. 895 (PGG), 2017 WL 1501394, at *3 (S.D.N.Y. Apr. 26, 2017)
(calculating base offense level for money laundering guideline as seven using the "offense
level for the underlying fraud offense from which the laundered funds were derived"
pursuant to U.S.S.G. § 2B1.1); United States v. Sinko, 394 F. App'x 843, 846 (3d Cir. 2010)
(affirming district court's base offense level calculation of seven for money laundering
conspiracy where the SUA was mail fraud); cf. United States v. Osuji, 413 F. App'x 603,
613 (4th Cir. 2011) (applying base level of six to a money laundering conspiracy conviction
because the SUA, healthcare fraud in violation of 18 U.S.C. § 1347, subjected defendants to
a maximum term of only ten years' imprisonment rather than the 20 or higher required for a
base offense level of seven).  It is also consistent with the calculation set forth in the plea
agreement between the parties.

    C.    Restitution

        The PSR states that the only victim of the offense of conviction (money
laundering conspiracy) for purposes of the Mandatory Victim Restitution Act ("MVRA"), 18
U.S.C. § 3663A, is the "integrity of the banking system."  PSR ¶ 31, PSR Add. at 1.  The
PSR consequently finds that the Caribbean Football Union (the "CFU"), the victim of the
underlying wire fraud scheme that constitutes the specified unlawful activity ("SUA") for
that money laundering conspiracy, is not entitled to mandatory restitution.  Id, citing In re
Local #46 Metallic Lathers Union ("Metallic Lathers"), 568 F.3d 81 (2d Cir. 2009).  The
defendant joins in this position.  Br. at 8-9.  Metallic Lathers, however, does not dictate such
a result in this case.  To the contrary, it supports the award of restitution to the CFU.

        Under the MVRA, restitution is mandatory for certain crimes, such as "an
offense against property under this title . . .  including any offense committed by fraud or
deceit."  18 U.S.C. § 3663A(c)(1)(A)(ii).  A district court thus must order restitution where
"an identifiable victim or victims has suffered a . . . pecuniary loss."  18 U.S.C.
§ 3663A(c)(1)(B).  The MVRA defines a victim as a "person directly and proximately
harmed as a result of the commission of an offense for which restitution may be ordered,"
including "any person [who is] directly harmed by the defendant's criminal conduct in the
course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

        The defendant in Metallic Lathers, like the defendant, pleaded guilty to money
laundering conspiracy, but in that case the relevant SUA was not wire fraud but instead

The Honorable Pamela K. Chen
October 27, 2017
Page 6

uttering forged checks.  568 F.3d at 82.  The <u>Metallic Lathers</u> defendant used the proceeds of the forged checks to pay his employees cash wages, hidden from the employees' union.  This conduct caused pecuniary harm to the union, which was denied dues it would have received had those employees been paid transparently.  <u>Id.</u> at 83.  The union sought restitution as a victim of the money laundering conspiracy, and the Second Circuit ruled that the union could not be awarded restitution under the MVRA because it suffered harm only after the money laundering conspiracy was completed.  <u>Id.</u> at 86-87.  Specifically, the Second Circuit found that the money laundering offense was complete as soon as the defendant cashed the forged checks, while the union only suffered harm when the defendant paid his employees with the cash that constituted the fruits of the completed laundering offense, after the checks were cashed.  <u>Id.</u> at 87.

As an initial matter, <u>Metallic Lathers</u> supports the government's position because when the Second Circuit analyzed the facts at issue, it presumed that the MVRA applied to money laundering convictions.  In other words, the issue the <u>Metallic Lathers</u> court decided was not whether the MVRA permitted restitution for money laundering convictions, but rather whether the union qualified as a victim of the particular money laundering offense charged in that case.  There would have been no need for the Second Circuit to perform such an analysis in <u>Metallic Lathers</u> if the only possible victim of a money laundering offense was the "integrity of the banking system."

Next, in determining who constituted a victim of the money laundering conspiracy at issue in <u>Metallic Lathers</u>, the Second Circuit looked to the statutory language of 18 U.S.C. § 3663A, which states that where the offense of conviction involved as an element a scheme, conspiracy, or pattern of criminal activity, a victim is "any person directly harmed by the defendant's *conduct in the course of the scheme, conspiracy or pattern*."  18 U.S.C. § 3663A(a)(2) (emphasis added); <u>see</u> <u>also</u> <u>Metallic Lathers</u>, 568 F.3d at 85.  Therefore, in order to identify any victims of the defendant's money laundering crime under the MVRA, the Court should determine whether anyone was directly harmed by the conduct the defendant engaged in *during the course of his money laundering conspiracy*.  To make that determination, the Court may look to the defendant's plea allocution, together with the context provided by the description of the conspiracy in the above-listed indictment.

In pleading guilty to the charged promotional money laundering conspiracy, the defendant admitted that he acted in furtherance of an effort by sports marketing companies to make a hidden payment to Webb, a payment the defendant consciously avoided (at the very least) knowing was a bribe related to the CFU's contract to sell Traffic the rights to CFU World Cup qualifier matches.  And it was this very scheme by Traffic and Media World to bribe Webb for those rights that also constituted the wire fraud conspiracy that is the SUA for the defendant's money laundering conviction.  Further, the defendant admitted during his allocution that to promote this SUA he caused the wire transmission of funds between the United States and overseas – some of the very same wire transmissions that form the basis of the underlying wire fraud SUA.  Thus, one of the elements of the

The Honorable Pamela K. Chen
October 27, 2017
Page 7

defendant's money laundering offense was also an element of the wire fraud conspiracy that indisputably victimized the CFU. These facts clearly show that the CFU was harmed by the conduct the defendant engaged in in furtherance of committing the money laundering offense of conviction, and is thus a victim of the money laundering offense under the MVRA.

That money laundering offenses may give rise to victims entitled to restitution under the MVRA is also shown by other occasions when the Second Circuit has affirmed, or district courts in the Second Circuit have authorized, restitution orders based on money laundering convictions. See, e.g., United States v. Gushlak, 728 F.3d 184, 188 (2d Cir. 2013); United States v. Gurung, 558 Fed. App'x 871, 2003 WL 296313, at *2 (2d Cir. 2003); Carnesi v. United States, 933 F. Supp.2d 388, 390 (E.D.N.Y. 2013). And other circuit courts have specifically held that money laundering can be an offense against property under the MVRA. See United States v. Luis, 765 F.3d 1061, 1066, (9th Cir. 2014), cert. denied, 135 S. Ct. 1572 (2015); United States v. Diaz, 245 F.3d 294, 296 (3rd Cir. 2001); United States v. Polichemi, 219 F.3d 698, 714 (7th Cir. 2000), certs. denied, 531 U.S. 993 (2000) & 531 U.S. 1168 (2001); see also United States v. Paradis, 219 F.3d 22, 24 (1st Cir. 2000) (noting no dispute between the parties that money laundering is an offense against property under the MVRA). For all of these reasons, the government respectfully submits that the CFU, as the victim of the honest services wire fraud scheme that the defendant promoted with his money laundering conduct, is a victim entitled to $3 million in restitution under the MVRA.

The defendant also believes that the government (and the Court) should "let it go" rather than seek restitution from the defendant for the CFU, because the bribe funds did not go to him. Br. at 8. Of course, this suggestion ignores the victim-centered purpose of restitution as a concept and the MVRA in particular, which is to make victims of a defendant's crimes whole, to the extent possible. That the defendant may not have financially profited from his criminal conduct makes him no less responsible to those he victimized through that conduct.[3]

For similar reasons, the defendant's complaint that imposing restitution on him would "subsidize" Webb misses the mark. Br. at 8-9. When Webb is sentenced, he will be held liable for making restitution to the CFU for this scheme as well, jointly and severally with the defendant. This comports with the victim-centered focus of the MVRA by maximizing the likelihood that the victim will be fully recompensed for its losses. To the extent the defendant complains about disparate effects of the same restitution order on Webb and the defendant, due to their respective financial situations, the Court may take into

---

[3] The defendant tries to support his argument by citing the Supreme Court's recent Honeycutt decision on forfeiture. Br. at 8 n.4. As the defendant himself notes, however, Honeycutt specifically deals with forfeiture and not restitution, the latter being a victim-focused remedy and the former a defendant-and-proceeds-focused prosecutorial tool to ensure that criminals do not profit from their crimes.

The Honorable Pamela K. Chen
October 27, 2017
Page 8

account the defendant's financial situation when assessing the rate at which the defendant
should be required to pay off the restitution order.  Further, since Webb (and others
convicted for their roles in the same scheme) have forfeited and will forfeit assets to the
government, such assets may be credited towards the restitution order as part of the
restoration or remission process, possibly reducing or even eliminating the defendant's
restitution liability.

As to the amount of the restitution order, as described in the PSR, the
underlying wire fraud SUA in this case involved an agreement by the sports marketing
company Traffic to pay Jeffrey Webb a $3 million bribe in exchange for Webb using his
influence to ensure that Traffic was awarded a contract for the overseas media and marketing
rights to the CFU's 2018 and 2022 cycle World Cup qualifier matches.[4]  As contemplated by
the bribe agreement between Traffic and Webb, the CFU subsequently entered into a contract
through which it sold these rights to Traffic.  Thus, the CFU suffered a loss of at least $3
million from the scheme, because the agreed-upon bribe amount itself demonstrates that
Traffic would have been willing to pay the CFU at least that amount for these rights, in
addition to the amount the CFU actually received (or was due to receive) under the terms of
the contract.[5]  Therefore, the government respectfully requests that the Court order restitution
against the defendant in favor of the CFU in the amount of $3 million.  The defendant should
be jointly and severally liable for this obligation with any other co-conspirators who are
convicted for their roles in this scheme to bribe Webb for the 2018/2022 CFU World Cup
qualifier rights.

D.    Section 3553(a) Analysis

For the reasons set forth below, a consideration of the sentencing factors set
forth in 18 U.S.C. § 3553(a) strongly supports imposition of a term of incarceration within
the applicable Guidelines range.

---

[4] As noted above, Media World, another sports marketing company, later agreed to
share in the cost and benefits of the bribe with Traffic.

[5] Because Traffic and Media World would have paid $3 million for the contract, this
$3 million bribery agreement amount should be the measure of restitution, not the
approximately $2 million that Webb actually received.  In effect, to date Media World has
profited $1 million more than was contemplated by the bribe agreement, at the expense of
both the CFU (which has a legitimate claim to that money) and Webb (who had only an
illegitimate claim to it).  Regardless of who benefited, all of the conspirators, including the
defendant, are responsible for the $3 million that should have gone to the CFU bud did not.

The Honorable Pamela K. Chen
October 27, 2017
Page 9

        1.     <u>Nature and Circumstances of the Offense</u>

        The nature and circumstances of the defendant's criminal conduct strongly support the imposition of a sentence within the applicable Guidelines range.  First, he corrupted CONCACAF and the CFU by facilitating a massive abuse of trust by Webb, a powerful soccer official.  And the defendant engaged in this conduct continuously, over a period of years, not as the product of a brief moment of weakness.  Second, the harmful effects of the defendant's scheme were concrete and damaged a victim.  Thanks to the efforts of the defendant and his co-conspirators, the CFU and its member federations lost $3 million in sorely needed funds.  That money could have gone towards youth or women's soccer development in that poverty-stricken region, through efforts like the construction of soccer fields in low-income areas, or providing uniforms, equipment or training to those in the Caribbean who could not afford them.  Instead, that money went into Webb's pocket, or the pocket of the Traffic executive who assisted him, or to the sports marketing companies that agreed to bribe Webb but didn't finish paying him the full $3 million bribe amount before the scheme was revealed.  And third, by using his experience in banking and finance, the defendant corrupted the financial systems of the United States and other jurisdictions in order to facilitate the payment of $2 million in bribes.  He did this by using shell companies, and by submitting bogus contracts and invoices to bank officials and lying to them about the funds he was transmitting and the accounts he was using.

        The defendant claims that his conduct does not "fit any traditional yardstick of money laundering."  Br. at 7.  And yet that is exactly what it does.  He promoted and disguised the payment of bribes through transactions involving multiple jurisdictions, shell companies, and sham contracts and invoices, and lies to bank personnel.  That is a money launderer's role.

        The defendant emphasizes the fact that he did not receive a "cut" of Webb's bribe proceeds, or charge a "laundering fee" like other defendants did, and that he instead committing his crime because of his relationship with Webb and because he got caught up in the excitement of being part of international soccer.  Br. at 5-6, 9-10, 24-25.  However, the fact that the defendant's motives may have been psychological or emotional rather than venal does not in any way mitigate his conduct.  Obviously, while the facts are entirely different here, a murderer who kills a spouse out of jealousy is no less (or more) morally responsible or reprehensible than a murderer who kills a spouse in order to collect life insurance proceeds.  This is not a case where the defendant can plausibly say that his criminal conduct was due to a misguided effort to do something he believed was positive.  Rather, he knew that what he was doing was wrong, but he did it anyway, and the reason he did it is not relevant.

        With respect to his role in the offense, the defendant argues that he was nothing more than a "bagman, gofer, errand boy, hanger-on, and factotum" for Webb.  Br. at 5.  And while the defendant was indeed those things, he also used his knowledge of, and

The Honorable Pamela K. Chen
October 27, 2017
Page 10

experience with, international financial transactions in order to independently devise the particular methods and means for receiving bribe payments on Webb's behalf after Webb instructed him to achieve that goal – in fact, his ability to do so was one of the reasons it made sense for Webb to ask the defendant to perform the task.  For this reason, the defendant was more than a mere "gofer" and should be punished accordingly.

The defendant also continues to maintain that he "closed his eyes to what should have been obvious," Br. at 5, or "closed his eyes to the aims and details" of Webb's corruption.  Br. at 32.  These protestations, even truncated as they are compared with his prior minimization of responsibility, simply defies logic and common sense.  To believe the defendant did not actually know that the payments he transmitted from sports marketing companies to Webb were bribes would require the Court to close its eyes to the obvious: by his own admission, the defendant participated in the creation of multiple sham contracts to mask bribe payments to Webb; he communicated in secret with various co-conspirators about the scheme; and he lied to a bank officer when he said that he was giving a swimming pool to Webb as a wedding gift.  Br. at 32.  The defendant has not acknowledged how deeply involved in the scheme he was, and his consciousness of it at the time.

In sum, while the defendant may not have played a large role or profited like other defendants in the case did, his manipulation of the financial system with bogus invoices and contracts, and his false statements to bank employees, all in furtherance of a $3 million bribe agreement, was egregious.  And that egregious conduct requires a significant sentence, one within the applicable Guidelines range.

## 2.   Factors Under 18 U.S.C. § 3553(a)(2)

As the Court is well aware, 18 U.S.C. § 3553(a)(2) requires the Court to consider at sentencing, among other things, adequate deterrence of criminal conduct, and promoting respect for the law – in this case, to deter others who would abuse their positions in sports governance, or abuse such positions held by friends, to enrich themselves, and assure the public that when prominent sports officials and their accomplices are caught engaging in such corrupt conduct they will be appropriately punished.  For far too long, too many such officials and their enablers have enriched themselves with impunity.  The sheer number of soccer officials who have been indicted or otherwise convicted in this and related cases demonstrates just how pervasive a problem this has been in the world of soccer, for decades, and how necessary it is for the Court to emphasize general deterrence in its sentence.

The damage to public confidence, in the United States, and all over the CONCACAF region, that important CONCACAF or CFU contracts will be fairly awarded, without abusive self-dealing by people in positions of power and influence, is a significant harm caused by the defendant's crime.  Yet this is not the only harm caused by the defendant's criminal conduct, but rather an additional harm beyond the $3 million in

The Honorable Pamela K. Chen
October 27, 2017
Page 11

concrete, financial loss he caused to the CFU.  These two types of harm together make the defendant's crime such a serious one, and so deserving of a Guidelines sentence that will deter others from engaging in similar conduct.

18 U.S.C. § 3553(a)(2) also requires the sentence to provide "just punishment" for the offense.  The defendant claims that he has already received "severe" punishment, in light of his ten months in prison while contesting extradition there,[6] the restrictions placed on him during pretrial release here, and his being isolated from family and friends in the United Kingdom and the Cayman Islands during that entire period.  Br. at 10-11.  But the defendant could have avoided his time in prison in Switzerland by choosing not to make his ultimately futile efforts to contest extradition, and could have avoided the length of time he spent on pretrial release (particularly under the more restrictive conditions imposed during the period before his guilty plea) by pleading guilty earlier.  The government does not doubt that the defendant's time on pretrial release in Miami was difficult in certain respects, but it can hardly compare to incarceration.  And as noted, while the defendant was indeed incarcerated in Switzerland, the government understands that he will get credit for the time he spent in custody there against any custodial sentence the Court imposes.

The defendant next argues that his status as a citizen of the United Kingdom also makes his punishment more severe, because he was subject to home confinement while on pretrial release, would be ineligible for a prison camp or halfway house if sentenced to term of incarceration, and will be detained in immigration custody pending his deportation. Br. at 11-13.  First, while the government certainly cannot and does not guarantee the length of time the defendant will remain in immigration custody following the conclusion of whatever sentence is imposed by the Court, the government understands from immigration authorities that in light of the stipulated order of removal the defendant signed, he is unlikely to spend more than two weeks in immigration custody before he is deported.  Second, while due to his immigration status the defendant is indeed ineligible to serve a portion of his sentence at a halfway house, the nature of his crime and personal characteristics make it unlikely that he would have been designated to a halfway house even if he was not a

---

[6] The Bureau of Prisons has informed the government that it will credit the defendant with time he served in custody in Switzerland if the PSR states that: (1) he was arrested on a specific date there; (2) due to the charges for which he is being sentenced here; (3) held in continuous custody overseas until extradition; and (4) not given credit against any other sentence for that time in foreign custody.  While these facts are stated or implied in the PSR, see PSR at ¶ 32, the government respectfully requests that the Court direct that the PSR be amended to specifically state those facts.  In light of the credit the defendant is expected to receive for the ten months he was incarcerated in Switzerland while awaiting extradition, the government requests that the Court take that into account when imposing a sentence.  For example, if the Court wishes for the defendant to spend an additional 36 months in custody, the Court should sentence him to a term of 46 months.

The Honorable Pamela K. Chen
October 27, 2017
Page 12

deportable alien; such facilities are designed and intended for inmates who need assistance transitioning back to society at large and adjusting to it – not typically older, professional white collar inmates like the defendant. And third, while it is correct that the defendant's status as a deportable alien renders him ineligible to serve his sentence in a prison camp, a prison camp is a "minimum security" facility. The defendant remains eligible to serve his sentence in a "low security" facility.[7]

Thus, a Guidelines sentence is necessary and appropriate for the following reasons related to 18 U.S.C. § 3553(a)(2): (1) to deter the many other officials who govern soccer, and the people around them, from similarly harming the organizations whose interests the officials are supposed to represent; (2) to encourage people who may have engaged in such conduct in the past to come forward and volunteer information in hopes of receiving leniency; (3) to assure the public – from "clean" sports officials who don't breach their duty of loyalty by accepting bribes or kickbacks, to soccer fans of modest means, to players on the field – that the law truly holds accountable people who, notwithstanding their high positions, abuse those positions for their own benefit; and (4) to warn those who would consider laundering the criminal proceeds of all kinds of criminal schemes, not only those involving bribery of soccer officials, that using the United States financial system for such laundering will be met with serious punishment.

3.    History and Characteristics of the Defendant

As the Court also knows, when formulating its sentence it must also consider the defendant's history and characteristics. The defendant naturally emphasizes his humble beginnings, and testimonials from friends, family, and others who know him. It is certainly appropriate for the Court to consider these submissions when deciding on a sentence.

What is also necessary for the Court to consider, however, is that the defendant was a sophisticated, experienced businessman, credentialed as a chartered accountant, who used that experience to evade banks' anti-money laundering procedures so he could facilitate the payment of $2 million in bribes. While he may have had a modest, and even sometimes difficult childhood, by the time he committed the charged offense he had long since become professionally accomplished and financially comfortable, even serving as a vice commodore of a yacht club in the Cayman Islands. The defendant's life circumstances should not elicit particular sympathy from the Court in the context of sentencing.

Further, the offense of conviction is not the only time the defendant has engaged in misconduct relating to soccer. As set forth in the PSR, over a period longer than

---

[7] Of course, as with any defendant, the government does not control the facility to which the defendant would be designated, a decision that lies within the discretion of the Bureau of Prisons.

The Honorable Pamela K. Chen
October 27, 2017
Page 13

a decade, the defendant participated in a scheme to violate FIFA's rules regarding the resale of tickets to FIFA World Cup matches, earning tens of thousands of dollars for himself and Webb.  Combined with the offense of conviction, this conduct demonstrates a pattern of unethical behavior.

IV.     Conclusion

       For the reasons set forth above, the government respectfully requests that the Court adopt the PSR except as noted above, order restitution against the defendant in favor of the CFU in the amount of $3 million, and impose a sentence within the applicable Guidelines range.

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney

By:     /s/ Paul Tuchmann
        Paul Tuchmann
        Samuel P. Nitze
        M. Kristin Mace
        Keith D. Edelman
        Kaitlin T. Farrell
        Assistant U.S. Attorneys
        718-254-6294

cc:     Defense Counsel (by ECF)
        Clerk of the Court (PKC) (by ECF)
        Jennifer Fisher, U.S. Probation Officer (by email)